UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
UNITED STATES OF AMERICA,  )
    Plaintiff,                              )
                                                    )
    v.                                           )    CRIMINAL NO. 04-10168-PBS
                                                    )
ADAM ELLARD, et. al,                 )
    Defendant.                            )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT
NORMAN BARNES' MOTION FOR REVIEW
OF THE ORDER ON DETENTION**

    This memorandum is in support of the defendant's motion, pursuant to 18 U.S.C. §3145(b), that the Court review the order detaining the defendant prior to trial.

**Prior Proceedings**

    Defendant was arrested on April 12, 2004 and charged, by complaint, with conspiracy to distribute cocaine base. (Exhibit A). The arrest resulted from an investigation of co-defendant Adam Ellard, in which agents made prior purchases of narcotics from him on March 3 and March 9, 2004. The transaction on April 12, 2004, arranged by Ellard, involved two ounces of a narcotic substance then believed to be crack cocaine.

**The Original Detention Order**

    The detention hearing was conducted on April 26 and 29. The evidence presented by the government consisted of the testimony of DEA Special Agent Steven Story (Exhibit B), his affidavit (Exhibit C), and a copy of a pending state court charge of marijuana distribution against Barnes. Agent Story testified that Ellard arrived at the scene in a Honda Civic driven by codefendant Hester. The car pulled in along with a Ford Focus driven by codefendant Robinson. Codefendant Tucker was in the front passenger seat, and defendant Barnes in the rear. Ellard

interacted with the undercover agent in the agent's vehicle. Ultimately, Robinson placed a package containing drugs on the front seat of the agent's car. (Exhibit B, pp. 10-17).

There was no testimony that defendant Barnes did anything at all.[1] Unlike other codefendants, he did not run away. Nothing was found on his person. There was no evidence that he had anything to do with the previous transactions with Ellard or the with the negotiations leading to this incident. In a later search, two weapons were found in the engine block of the Focus. However, there was no evidence that defendant knew of or was connected to these weapons in any way.

On April 29, the Court found probable cause to believe that defendant "committed the crime as charged in the criminal complaint." (Exhibit D ).

The Court issued its order of detention on May 25, 2004, relying on both danger to the community and risk of flight. (Memorandum and Order on Government's Motion for Detention)("Detention Order")(Exhibit E). As to the first, the Court noted the following:

> The defendant, while on release from two courts, was present at a prearranged drug deal. He arrived in the car that brought the cocaine to the location and was present in the car during conversations leading up to the actual transfer of the cocaine to the UC the car the defendant was traveling in had two loaded firearms concealed under the hood.

---

[1] Story testified that in between interactions with Ellard, Elland went over to the Focus, put his head inside, and engaged in conversation with the occupants. However, it was dark, and Story was 45 to 60 feet away. The Focus was facing him (and thus Barnes was behind the other occupants). He could not see the faces or lips of the occupants – he could see only the right side and back of Ellard and the motion of his head. (Exhibit B, pp. 74-76).

Story's affidavit in support of the Complaint stated that in a post-arrest statement, co-defendant Ellard had implicated defendant Barnes in participating in discussions at the scene. This is hearsay, of course, would not be admissible against the defendant at trial, and was not relied upon by the magistrate judge. See Exhibit E.

-2-

> While the defendant's precise role in the transaction is not clear, it is not the practice of drug dealers to bring innocent spectators along to what was clearly not a casual drug deal but a prearranged "buy" of $2,350 worth of cocaine.  The facts suggest that the defendant was a trusted confederate.
>
> The pending Suffolk and Brockton cases strongly suggest that the defendant is unable to stay away from guns and drugs.  The facts giving rise to the present charge combine these two elements.  It is clear that the defendant is unable to abide by conditions of release to refrain from gun and drug related behavior and therefore he constitutes a danger to the community.

(Detention Order, p. 19).

As for risk of flight, the Court observed that "defendant has been a lifelong resident of the Boston area."  However, the Court noted that he had "been living a somewhat itinerant lifestyle," in that he had lived the six months prior in Brockton with his girlfriend, aunt and cousin, and before that "at various addresses in Dorchester and Roxbury with his grandmother."  Id. p. 20.  The Court noted a "minimal" employment history.  The Court also noted that he had "four defaults and two probation violations" in his criminal history, and that he faces charges in Suffolk Superior and Brockton district court, from which he was on release when the instant arrest occurred.  "This strongly suggests that the defendant cannot abide by conditions of release and that he cannot be relied upon to appear as required."  Id. p. 21.

### The Indictment

Defendant was indicted on May 27, but only for conspiracy to possess and distribute cocaine (Count One), and possession and distribution of cocaine (Count Three).  (Exhibit F).  Defendant was not charged with any cocaine base offense or any offense involving firearms.

**The Order on Reconsideration**

After indictment, the defendant moved for reconsideration of the detention order, and the magistrate judge agreed to reconsider. (Order of 9/7/04). The motion was heard on September 9. At the hearing, the defendant brought to the court's attention that, inter alia, he had been indicted on far less serious offenses than charged in the complaint; that, in fact, he did not have a significant prior history of defaults; and that he had arranged for a suitable pre-trial living arrangement and third-party custodian. On reconsideration, at the conclusion of the hearing, the magistrate judge agreed that there was no basis to conclude that the defendant is a risk of flight. However, she adhered to her prior finding of risk to the community, and, on that basis, reaffirmed the detention order. (See Clerk's Notes for 9/9/04).[2]

**Present Status**

A status conference was held by the magistrate judge on October 5, 2001. At that time, the defendant answered that he was ready for, and desired, an immediate trial. However, the other defendants stated that they were not ready because the government had yet to produce copies of surveillance tapes -- which should have been supplied months before.[3] Accordingly, the co-defendants requested further time to prepare.

Thereafter, this Court set the case for trial on January 3, 2004.

---

[2] Defendant has requested a transcript of the hearing, but it has not been produced as yet.

[3] The tapes were sent to the Duplication Center on that day or the day before.

**Argument**

This defendant has now been in custody for more than six months, since April 12. Although the Government established probable cause at the detention hearing – and has since obtained an indictment – this was based on the thinnest showing. In fact, the Government has yet to produce any admissible evidence that the defendant actually did anything more than be present at the scene of a crime. Indeed, since the original detention order, the charges against the defendant have shrunk from a complaint involving a ten year mandatory minimum sentence to an indictment entailing a sentence (according to the guidelines) of little as six months, and in no event more than 30.[4/]  Nor has he been charged with any firearms offense. At the same time, his pending state charges -- upon which the magistrate judge also relied -- have been whittled down as well. (The Brockton charge was first reduced to simple possession of marijuana, at the request of the Commonwealth, and then, finally, dismissed altogether.) Yet, the Government, through its inaction in providing timely discovery, has prevented the defendaant from obtaining the speedy trial to which he is entitled. The upshot is that unless the detention order is lifted, the defendant is very likely to serve more time prior trial than he would serve even if convicted. The authority detain for dangerousness does not extend to a power to confine beyond the

---

[4/] The defendant has a Criminal History of Level II. Under USSG §2D1.1, the Base Offense Level for 50 grams of cocaine is 16. If he receives no adjustments of any kind, his guideline range would be 24 to 30 months. Since there is no evidence that defendant actually did anything at all, he would be entitled, under §3B1.2, to a "minor" or "minimal" role adjustment of from two to four levels. Thus, if he received the maximum role adjustment, and an adjustment for acceptance of responsibility, his offense level would reduce to 9, a Zone B level, and his range would be 6 to 12 months, with the possibility of home or community confinement.

The fact that defendant in actuality has a comparatively mild exposure is a highly relevant circumstance in considering what weight to give any presumption based upon the charge August 30, 2004. United States v. Moss, 887 F.2d 333 (1st Cir. 1989).

sentence a defendant would actually serve for punishment for the crime charged.

As an alternative, the defendant has proposed a realistic plan for his release prior to trial, which would have the defendant remain under conditions of house arrest at the home of his aunt, Victoria Madison, in Brockton. The Pre-Trial services officer has recommended against this arrangement because, although she "may well be a responsible, hard working citizen," she "not only works full time, but is actively involved in raising six children," and also because the "defendant remains a danger and a flight risk under any conditions." (Exhibit G). But the fact that Ms. Madison is a hardworking mother of six supports rather than detracts from her suitability. The proposed arrangement would entail a stable living situation provided by a responsible person. The Court would not have to rely on the full-time supervision by defendant's aunt. Rather, enforcement of the terms of the home detention would be accomplished by electronic bracelet technology. With these conditions in place, defendant would not present any sort of risk.

## Conclusion

For the reasons set forth above, the Court should review and revoke the order of detention, and release the defendant on conditions, prior to trial.

Respectfully submitted,

/S/ Max D. Stern
Max D. Stern
BBO No. 479560
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114-2022
(617) 742-5800

Dated: October 20, 2004.
G:\SSWG\BARNES, NORMAN\detention review memo.wpd

-6-