# EXHIBIT B

1

1 - 99

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                    Plaintiff,  )
                                   )
-V-                                )   MAGISTRATE DOCKET NO.
                                   )   04-00817-MBB
ADAM ELLARD, et al                 )
                    Defendants.)


DETENTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

April 26, 2004

Boston, Massachusetts


APPEARANCES ON PAGE 2


Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.


*APEX Reporting*
(617) 426-3077

APPEARANCES:

For the United States:

    DAVID TOBIN, ESQ.
    MICHAEL J. PELGRO, ESQ.
    Office of the United States Attorney
    1 Courthouse Way
    Boston, MA  02210
    (617) 748-3100

For Defendant Ellard:

    JAMES J. COVIELLO, ESQ.
    281 Beach Street
    Revere, MA 02151
    (781) 289-1468

For Defendant Hester:

    SYRIE D. FRIED, ESQ.
    Federal Defender's Office
    408 Atlantic Ave., Third Floor
    Boston, MA 02210
    (617) 223-8061

For Defendant Robinson:

    ROGER A. COX, ESQ.
    Cox & Cox
    30 Main Street
    Ashland, MA 01721
    (508) 231-1460

For Defendant Tucker:

    MATTHEW H. FEINBERG, ESQ.
    Feinberg & Kamholtz
    125 Summer Street, 6th Floor
    Boston, MA 02110
    (617) 526-0700

For Defendant Norman Barnes:

    JONATHAN SHAPIRO, ESQ.
    Stern, Shapiro, Weissberg & Garin
    90 Canal Street, Suite 500
    Boston, MA 02114-2022
    (617) 742-5800

3

<u>I N D E X</u>

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Steven Story | | | | |
| By Mr. Tobin | 5 | | 83 | |
| By Mr. Coviello | | 26 | | 85 |
| By Ms. Fried | | 38 | | 86 |
| By Mr. Cox | | 53 | | 91 |
| By Mr. Feinberg | | 55 | | 91 |
| By Mr. Shapiro | | 68 | | 92 |

| EXHIBITS: | PAGE |
|---|---|
| Government | |
| No. 1    Affidavit | 20 |
| No. 2    Document Re: Robinson | 94 |
| No. 3    Document Re: Barnes | 94 |
| Defense | |
| A    Drawing | 65 |

1            P R O C E E D I N G S

2            THE CLERK:  Today is Monday, April 26th, 2004.

3    The case of the United States v. Adam Ellard, et al,

4    Magistrate Judge No. 04-817 will now be heard before this

5    Court.  Will counsel please identify themselves for the

6    record?

7            MR. TOBIN:  Good afternoon, Your Honor.  David

8    Tobin with Michael Pelgro for the United States.

9            THE COURT:  Thank you.

10           MR. COX:  Good afternoon, Your Honor.  Roger Cox

11   for Tavon Robinson.

12           THE COURT:  Thank you.

13           MR. COVIELLO:  Good afternoon, Judge.  Jim

14   Coviello on behalf of defendant Adam Ellard.

15           THE COURT:  Thank you.

16           MR. FEINBERG:  Your Honor, Matthew Feinberg

17   representing Steven Tucker.

18           THE COURT:  Thank you.

19           MR. SHAPIRO:  Your Honor, Jonathan Shapiro

20   standing in for Max Stern, representing Norman Barnes.

21           THE COURT:  Thank you.

22           MR. FRIED:  Good afternoon, Your Honor.  Syrie

23   Fried on behalf of Willie Hester.

24           THE COURT:  Thank you, very much.  Well, we're

25   here for the purposes of detention and probable cause.  Are

1  all counsel ready to go forward?

2              MR. TOBIN:  Yes, Your Honor.

3              MR. COVIELLO:  Yes, Judge.

4              MR. COX:  Yes, Your Honor.

5              MR. FEINBERG:  Yes, Your Honor.

6              MR. SHAPIRO:  Yes, Your Honor.

7              MS. FRIED:  Yes, Your Honor.

8              THE COURT:  All right.  Then will the government

9  proceed and call your first witness.

10              MR. TOBIN:  Thank you, Your Honor.  The government

11  first calls Special Agent Steven C. Story.

12              THE COURT:  Will you please come forward and be

13  sworn.

14              (The witness takes the stand and is sworn.)

15                    DIRECT EXAMINATION

16              BY MR. TOBIN:

17      Q    Please state your full name and spell both your

18  first and last names for our court record.

19      A    My name is Steven C. Story, S-T-E-V-E-N,

20  S-T-O-R-Y.

21      Q    Sir, how are you employed?

22      A    I'm a senior special agent with the Drug

23  Enforcement Administration.

24      Q    How long have you served with the Drug Enforcement

25  Administration?

6

1    A    Seventeen years.

2    Q    And to which unit within the DEA are you currently

3    assigned?

4    A    I'm currently assigned to the DEA's Mobile

5    Enforcement Team of the Boston Field Office.

6    Q    And how long have you been a member of the Mobile

7    Enforcement Team, please?

8    A    Approximately, one year.

9    Q    And what are your primary duties and

10    responsibilities as a member of the DEA Mobile Enforcement

11    Team?

12    A    I'm one of the case agents assigned to an

13    investigation focusing on drug distribution on the North

14    Shore area of Boston.

15    Q    Special Agent Story, I'm going to ask you some

16    questions about the time frame of February and March of this

17    year, 2004.  At that time, were you involved in an ongoing

18    investigation on the North Shore?

19    A    Yes, sir, I was.

20    Q    And at that time, did this investigation begin to

21    focus on at least one individual?

22    A    Yes, sir, that's correct.

23    Q    And who was that, please?

24    A    That would be defendant Adam Ellard.

25    Q    Now, after the investigation began to focus on

1    Adam Ellard, were there any purchases of controlled

2    substance -- or substances from defendant Ellard?

3         A    Yes, sir, there were.

4         Q    Can you tell us approximately or can you tell us

5    what was first purchased from him?

6         A    An undercover agent first purchased 1,000 Vicodin

7    tablets from defendant Ellard on March 3rd, 2004.

8         Q    Now, at that time or shortly thereafter, was

9    another sale, if you will, arranged or negotiated with

10    defendant Ellard?

11         A    Yes, sir.

12         Q    And did that culminate now in a second purchase?

13         A    Yes, sir, it did.

14         Q    When was that, please?

15         A    That second transaction occurred on March 6th,

16    which was a half ounce -- approximately 14 grams -- of crack

17    cocaine purchased from defendant Ellard in the Dorchester

18    section of Boston.

19         Q    And, sir, just so it's clear, both the 100 Vicodin

20    and the 14 grams, if you will, of crack cocaine, both of

21    those were purchased from defendant Ellard by an undercover

22    DEA agent?

23         A    Yes, sir, that's correct.

24         Q    Okay.  Now, perhaps lastly or for our purposes

25    more importantly, was there a third sale of illegal drugs

1  negotiated with defendant Ellard?

2      A    Yes, sir.

3      Q    And when was that sale supposed to take place?

4      A    The transaction -- that third transaction was

5  initially negotiated on April 8th, 2004 and arrangements

6  were made for the transaction to occur on April 12th, 2004.

7      Q    And was this going to be sold to the same

8  undercover DEA agent who had bought twice previously from

9  the defendant Ellard?

10     A    Yes, sir, that's correct.

11     Q    And this third time, if you will, what was going

12 to be purchased?

13     A    The third transaction was going to involve the

14 purchase of two ounces of crack cocaine.

15     Q    And approximately, how many grams, for those of us

16 who might not be as familiar with the metric system?

17     A    Twenty-eight grams per ounce, for a total of 56

18 grams to be purchased by --

19     Q    And this was to take place on what date, again,

20 please?

21     A    April 12th.

22     Q    And where was this to take place?

23     A    In the Dorchester section of Boston.

24     Q    Okay.  And actually, when that date arrived, if

25 you would very briefly in a summary fashion, what took

1  place?

2       A     On April 12th, the undercover agent had a series

3  of recorded and unrecorded telephone calls to finalize the

4  transaction.  During those calls, defendant Ellard directed

5  the transaction to occur in the parking lot of the

6  Bickford's Restaurant near the South Bay Plaza off of 93

7  south -- or the Southeast Expressway.

8       Q     And what time was the undercover agent to meet

9  with Ellard on that day?

10      A     Defendant Ellard initially anticipated the

11 transaction would occur at about 5:00 p.m., so the

12 undercover agent and the surveillance team traveled to that

13 location at approximately 5:00 p.m.

14      Q     So, Special Agent Story, after negotiations had

15 been done over the telephone, what actually transpired?

16      A     After the undercover agents arrived in the parking

17 lot, there were a series of ongoing telephone calls between

18 the undercover agent and defendant Ellard.  And he explained

19 that he was running late and that he was awaiting a ride, in

20 order to conduct the transaction.  He instructed the

21 undercover agent just to wait and stand by at the Bickford's

22 Restaurant.

23      Q     Now, in addition to the undercover -- pardon me --

24 the undercover agent, were there backup or surveillance

25 units also stationed in and around the Bickford's parking

10

1    lot?

2        A    Yes, sir.

3        Q    At some point, was there contact again, between

4    the undercover agent and defendant Ellard?

5        A    Yes, sir.  The phone calls continued until a point

6    at which defendant Ellard explained that he was right around

7    the corner from the Bickford's and he would be arriving

8    momentarily.  And at that time, I observed defendant Ellard

9    traveling in a vehicle, driven by defendant Willie Hester,

10    pull into the Bickford's parking lot.

11        Q    And what kind of vehicle was that; do you recall?

12        A    It was a black Honda Civic.

13        Q    And then what happened?

14        A    As that black Honda Civic -- again, being driven

15    by defendant Hester and occupied by defendant Ellard --

16    pulled into the lot, I observed that there was a silver Ford

17    Focus traveling directly behind it, as they entered the

18    Bickford's lot together.  That vehicle was driven by

19    defendant Tavon Robinson.  It was occupied in the front

20    passenger seat by defendant Steven Tucker.  It was operated

21    in the rear passenger seat by defendant Norman Barnes.

22        Q    You've mentioned defendants Ellard, Hester,

23    Robinson, Tucker and Barnes.  Do you see all of them in the

24    courtroom today?

25        A    Yes, sir, I do.

1    Q    Are they the individuals arrayed in the first row

2    of the jury box?

3    A    Yes, sir, that's correct.

4    Q    I think your narrative now has taken us with -- to

5    the point where two vehicles now have entered the Bickford's

6    parking lot area.  Then what did you observe or what

7    happened?

8    A    I observed the defendant Hester park the Honda

9    Civic so it was facing the Bickford's restaurant.  And at

10   that time, I also observed the silver Focus driven by

11   defendant Robinson continue around defendant Hester's

12   vehicle, pass through the parking lot directly in front of

13   the undercover vehicle.  And then defendant Robinson parked

14   that Ford Focus in the opposite direction so it was facing

15   away from the Bickford's Restaurant, generally, next to the

16   Honda Civic.

17   Q    At some point thereafter, was there contact

18   between the undercover agent and defendant Ellard?

19   A    Yes, sir.

20   Q    What happened?

21   A    As soon as the Ford Focus parked, defendant Ellard

22   got out of the Honda Civic.  The Honda Civic remained parked

23   in the same place, and defendant Ellard got into the

24   undercover vehicle with the undercover agent.

25   Q    What transpired thereafter?

12

1      A      There were extended negotiations inside the

2  undercover vehicle.  At which time, the undercover agent

3  showed defendant Ellard the purchase money for the crack

4  cocaine.  The previously negotiated price was $1,175.00 per

5  ounce.  Defendant Ellard counted the money, and then he

6  informed the undercover agent that he needed to take the

7  money in advance and go to both vehicles.  He then pointed

8  out both the Honda Civic and the Ford Focus to the

9  undercover agent and said that the cocaine had been divided

10  between those two vehicles.

11      Q      What then happened?

12      A      The undercover agent denied the request to front

13  the money.  He explained that he wanted to see the crack

14  cocaine first.  There was some conversation about that.  And

15  at that point, I observed defendant Ellard get out of the

16  undercover vehicle and walk to the front passenger --

17  correction -- front driver side of the Honda Civic.

18      Q      The car that he had arrived in?

19      A      Yes, sir.

20      Q      The car that Mr. Hester was still in?

21      A      Correct.

22      Q      What then transpired?

23      A      I then observed them have a conversation through

24  the open window of that Honda Civic.  At which time,

25  defendant Ellard leaned into the window of the driver's side

*APEX Reporting*
(617) 426-3077

13

1    and spoke to defendant Hester.

2        Q    What then did you observe?

3        A    After a period of time and that conversation, then

4    defendant Ellard walked over to the silver Ford Focus and

5    leaned into the open passenger side of the Ford Focus and

6    had a lengthy conversation with all three occupants of the

7    vehicle.

8        Q    Further observations when that -- and did he ever

9    get into the car at that point just leaned in and speak?

10       A    Just leaned into the front passenger side.

11       Q    At some point, did that conversation seemingly

12   end?

13       A    Yes, sir.

14       Q    Then what happened, sir?

15       A    At that point, defendant Ellard walked back to the

16   undercover vehicle, got inside the car sitting in the front

17   passenger side, instructed the undercover agent to back up,

18   so he was basically -- the rear of the undercover vehicle

19   would be parked adjacent to the rear of the silver Ford

20   Focus.  At which time, the undercover agent agreed to move

21   the vehicle in that fashion.  Defendant Ellard stayed in the

22   car and traveled with him a short distance, as he backed

23   through the lot.  At that point, defendant Ellard again said

24   that now that the cars were close together, the undercover

25   agent shouldn't be as concerned about providing him the

14

1  money and that he still needed to take the money to the

2  silver Ford Focus, in order to make the deal happen.

3      Q    And at that time, were defendants Robinson, Tucker

4  and Barnes still inside the silver Ford Focus?

5      A    Yes, that's correct.

6      Q    Well, at that point, what was the position of the

7  undercover DEA agent, with regard to handing over the money?

8      A    He still denied that request and said he must

9  first inspect the cocaine, before he provided the money in

10  advance.

11      Q    What arrangement or what agreement then was

12  reached, if any?

13      A    At that point, there was still no agreement, as

14  far as structuring the deal, so defendant Ellard got out of

15  the car and returned to the passenger window of the Ford

16  Focus and leaned in and continued with a conversation with

17  the three occupants of that vehicle.

18      Q    And again, previously, he had indicated that a

19  portion of the cocaine was in that Ford Focus?

20      A    Correct.

21      Q    Then what happened?

22      A    After about two minutes, I instructed the

23  undercover agent to back -- to move away from the vehicle

24  that he was in -- the position in which he was located.  I

25  directed him to another spot in the lot nearby.

15

1    Q    And you had communication with the undercover

2  agent who was still in his car, if you will, through a radio

3  transmission?

4    A    Through a cell phone service, sir.

5    Q    Cell phone, excuse me.  Did he, in fact, comply

6  with your request to move his vehicle?

7    A    Yes, sir, he did.

8    Q    Where did he move it to?

9    A    He moved to another spot in the parking lot about

10  approximately 15 yards away, diagonally from the --

11    Q    From the Ford Focus; from the silver Ford?

12    A    Yes, sir.

13    Q    And then what happened, sir?

14    A    I observed defendant Ellard continue with a

15  conversation in the passenger side of the Ford Focus.  And

16  at a particular point, I observed defendant Robinson get out

17  of the driver's side of that vehicle.

18    Q    Yes, sir.  And then what did you -- what, if

19  anything, did you see defendant Robinson then do?

20    A    Defendant Robinson then went to the hood of the

21  car.

22    Q    The Ford?

23    A    The Ford.  He opened the hood slightly.  He

24  returned back to the driver's side, which -- the driver's

25  side door, which was still open, had a brief conversation

16

1    there.  And then he walked over to the undercover officer's

2    vehicle.

3        Q    What happened when defendant Robinson then

4    approached or arrived at the undercover vehicle?

5        A    Defendant Robinson leaned into the undercover

6    vehicle, had words -- stated words to the effect of this

7    shit, as in the deal is taking too long.  Defendant Robinson

8    placed the package containing the cocaine on the driver's

9    seat -- correction, the front passenger seat of the

10   undercover vehicle.  And the undercover agent handed the

11   purchase money to defendant Robinson.

12       Q    Now, was this transaction for the entire amount of

13   the cocaine?

14       A    Yes.

15       Q    And was it also -- was the entire amount of money

16   handed over, at that point?

17       A    Yes.

18       Q    And you've been involved in the -- sort of, the

19   investigating, if you will, of the illegal narcotics trade

20   for how many years?

21       A    Seventeen years, sir.

22       Q    Have you ever seen the engine block or the hood of

23   a car to be utilized as a place to store drugs?

24       A    I've observed that used as a smuggling compartment

25   in the past.

17

```
1      Q    After the deal was completed, if you will, with

2   the exchange of the crack cocaine or the cocaine base and

3   the cash, then what happens, sir?

4      A    At that point, defendant Robinson returned to the

5   driver's side of the Ford Focus.  At which time, the arrest

6   signal was given and the arrest team began to move in to

7   effect the arrest of all the defendants.

8      Q    Now, at this point or perhaps at the time of the

9   exchange between defendant Robinson and the undercover

10  agent, where is Ellard at this point?

11     A    He remained at the passenger side of the Ford

12  Focus.

13     Q    And were the five individuals that you've referred

14  to and named, were they all apprehended at that time?

15     A    Well, as the arrest team moved in, defendant

16  Robinson fled on foot toward the Bickford's parking lot.

17     Q    Was he still in transit from where he had sold the

18  drugs back to the Ford, at that point?

19     A    He'd actually reached the driver's side door,

20  which had remained open.

21     Q    But he was not yet -- was he inside the car?

22     A    No, sir.

23     Q    Okay.  So he fled on foot?

24     A    Yes, sir.

25     Q    And what happened with regard to him,
```

18

1    specifically, Robinson?

2        A    Defendant Robinson was apprehended in the

3    Bickford's parking lot, as he fled in a direction generally

4    parallel with the Southeast Expressway.

5        Q    Now, what about Ellard and Tucker and Barnes --

6    the three individuals who were either in or around the Ford?

7    Were they apprehended?

8        A    Yes.  Defendant Ellard was apprehended, after he

9    fled in foot -- on foot, in the opposite direction of

10    defendant Robinson.  And he was apprehended in the vicinity

11    of the gas station that was located right in that Bickford's

12    plaza, near South Bay.

13        Q    So you have Robinson going one way, Ellard going

14    the other?

15        A    Correct.

16        Q    And the two individuals who were in the Ford --

17    the two remaining.  Did they ever get out, or were they

18    apprehended before they were able to?

19        A    They were -- defendant Tucker and defendant Barnes

20    were apprehended, as their vehicle was contained in the lot.

21    And then defendant Hester was the last to be arrested, as he

22    remained in his Honda Civic.

23        Q    Did any of the vehicles move or try to get --

24    leave, during the course of the apprehension?

25        A    No, sir.

1      Q    Not at that point, okay.  Now -- Your Honor, may I

2  approach the witness, please?

3           THE COURT:  You may and you need not ask again.

4           MR. TOBIN:  Thank you, Your Honor.

5           BY MR. TOBIN:

6      Q    Could you just review what I've just handed to you

7  and tell us what that is?

8      A    Yes, sir.  This is a copy of the criminal

9  complaint and accompanying affidavit.

10      Q    And that affidavit is, in fact, signed by you; is

11  that accurate?

12      A    Yes, sir, it is.

13      Q    And is that a fair and accurate recitation of the

14  facts of this investigation involving, specifically, the

15  purchase of crack cocaine on the date in question, April

16  12th?

17      A    Yes, sir, other than one correction that --

18      Q    What is that?

19      A    -- needs to be made on page 4, paragraph 14.

20  There's a typographical error, which identifies defendant

21  Barnes as Nelson Barnes.  It should read Norman Barnes, as

22  it does on the cover sheet of the criminal complaint.

23      Q    I'll take that back from you, if I might.  With

24  that exception, is this a fair and accurate depiction or

25  representation -- a report, if you will, of the

20

1  investigation that culminated on that date, April 12th, with

2  the arrest of these five individuals?

3      A    Yes, sir, it is.

4          MR. TOBIN:  Your Honor, I believe that my brothers

5  and sister have copies of this (u).

6          THE COURT:  All right.  The affidavit will be

7  marked as Government's Exhibit 1.

8                              (Exhibit No. 1 was marked for

9                              identification.)

10          MR. SHAPIRO:  I have an objection to the admission

11  of a number of statements in the affidavit against

12  Mr. Barnes.  The affidavit contains a number of post-arrest

13  statements of other defendants, which incriminate

14  Mr. Barnes.  And I believe that that's a Boutin violation,

15  it raises a Sixth Amendment issue, and I object to any

16  introduction of those statements against Mr. Barnes.

17          THE COURT:  Well, I'll take it with that objection

18  noted.

19          MR. FEINBERG:  Could I join that object, Your

20  Honor?

21          MS. FRIED:  I would also join that objection, on

22  behalf of Mr. Hester, particularly with respect to

23  statements that were made by -- reportedly made by

24  Mr. Ellard, which purport to implicate Mr. Hester.

25          MR. COX:  I also join that objection on behalf of

1    Mr. Robinson, Your Honor.

2            THE COURT:  So noted.

3            MR. COVIELLO:  For the record, I do not join that

4    objection.

5            MR. TOBIN:  Thank you, Your Honor.  May I resume?

6            THE COURT:  You may.

7            MR. TOBIN:  Thank you, Your Honor.

8            BY MR. TOBIN:

9    Q     The Ford vehicle that you have made reference to,

10   Special Agent Story, the one that brought defendants

11   Robinson, Tucker and Barnes to the parking lot.  After the

12   apprehension and arrest of the five defendants, was that

13   automobile examined and searched?

14   A     Yes, sir, it was.

15   Q     Can you please tell the Court what, if anything,

16   was found during the course of that search?

17   A     During the course of that search, two loaded

18   handguns -- semi-automatic pistols were discovered --

19           THE COURT:  This is the Ford, correct?

20           THE WITNESS:  Correct, Your Honor.  Were

21   discovered under the hood of the car, in a natural void near

22   the hinge area of the driver's side.  They were all --

23   additionally, there was a blue neoprene rubber cold weather

24   ski mask, and there was a box of latex gloves discovered in

25   that vehicle.

```
 1            BY MR. TOBIN:

 2       Q     Where -- sir, where was the cold weather mask and

 3   the box of rubber gloves located within that vehicle?

 4       A     I believe they were in the backseat area of that

 5   vehicle.

 6       Q     And was any investigation done to determine the

 7   ownership of that Ford?

 8       A     Yes, sir.

 9       Q     And what did that investigation reveal, sir?

10       A     The Ford Focus was rented on April 8th from Budget

11   Rent-a-Car at a Manchester, New Hampshire airport by

12   defendant Tucker's sister, Cleo Mercer.

13       Q     And it was rented from April 8th.  Was there a

14   termination date or an end date for that rental period; do

15   you recall?

16       A     Yes, sir, April 15th.  It was a one-week rental.

17            THE COURT:  What was her name, again?

18            THE WITNESS:  Cleo Mercer, Your Honor.

19            THE COURT:  Thank you.

20            BY MR. TOBIN:

21       Q     And that was defendant Tucker's sister, you say?

22       A     Yes, sir.

23       Q     And again, just so that it's clear.  I think I've

24   asked you this previously.  Tucker was in that car when it

25   pulled into the parking lot; is that accurate?
```

23

```
 1        A     Yes, sir.

 2        Q     Where was his location within the car?

 3        A     He was in the front passenger seat.

 4        Q     And again, just as a bit of a review, who was

 5   driving the car, at that time?

 6        A     Defendant Robinson.

 7              MR. TOBIN:  If I may have just a moment, Your

 8   Honor, please.

 9              THE COURT:  Take your time.

10              (Pause.)

11              BY MR. TOBIN:

12        Q     The second automobile, the automobile that brought

13   Ellard -- defendants Ellard and Hester to the scene, was

14   that car also searched after the apprehension and arrests of

15   the five defendants?

16        A     Yes, sir.

17        Q     What, if anything, was located in that car,

18   please?

19        A     There was a loaded Raven .25 automatic --

20   semi-automatic pistol found in the pocket of the backside of

21   the passenger seat.

22        Q     Backside -- does the front seat of that vehicle --

23   is that a bench seat, like in the old days or are those some

24   sort of bucket seats?

25        A     Bucket style seat.
```

1    Q    So would the driver of that vehicle have had

2  access to that weapon?

3         MS. FRIED:  Objection, calls for speculation.

4         THE COURT:  I don't think so.

5         BY MR. TOBIN:

6    Q    Have you had an opportunity to -- thank you, Your

7  Honor.  If I may, you had an opportunity to view the

8  interior of that vehicle?

9    A    Yes, sir.

10   Q    And would the driver of that vehicle have had

11 access to where the weapon was found?

12   A    Yes, sir.

13   Q    How?

14   A    The driver would simply need to reach behind the

15 front passenger seat and reach into the map pocket of that

16 -- of that seat to retrieve the weapon.

17   Q    So again, as a matter of review, one vehicle --

18 that vehicle had one weapon in it?

19   A    Yes, sir.

20   Q    In the passenger compartment?

21   A    Yes, sir.

22   Q    The Ford rent-a-car or the Ford -- the silver Ford

23 that had been rented had two loaded vehicles (sic)?

24   A    It had two loaded weapons, yes, sir.

25   Q    I'm sorry.  I misspoke.  Both which were found in

25

1   or around the engine block?

2       A    Yes, sir.

3       Q    Was any -- all five of these individuals

4   presumably -- or let me ask you.  Were all five of these

5   individuals searched upon their arrest?

6       A    Yes, sir.

7       Q    And was contraband found on any of them, that you

8   can recall?

9       A    Yes, sir.  Defendant Robinson had the total

10  amount of serialized -- previously serialized buy money on

11  his person, along with a small amount of crack cocaine and

12  marijuana.

13      Q    And other than the crack cocaine and marijuana

14  found on defendant Robinson, were any other drugs found on

15  any of the other individuals?

16      A    No, sir.

17      Q    I should ask, by the way, the -- that which was

18  purchased, the crack cocaine, was that actually field

19  tested?

20      A    Yes, sir.

21      Q    And what was the result of field tests on that

22  material or that substance?

23      A    The field test yielded positive results for

24  cocaine -- presence of cocaine -- hydrochloride.

25          MR. TOBIN:  Thank you.  Your Honor, I have no

26

1    other questions at this time.

2              THE COURT:  All right.  Cross-examination in the

3    order in which the defendants are named in the complaint.

4              MR. COVIELLO:  Thanks, Judge.

5              THE COURT:  Mr. Coviello?

6                        CROSS EXAMINATION

7         BY MR. COVIELLO:

8         Q    Good afternoon, Special Agent.  How are you?

9         A    Good, sir.  Afternoon.

10        Q    You testified as to, essentially, three separate

11   transactions involving Mr. Ellard, my client, correct?

12        A    Yes, sir, that's correct.

13        Q    The first one involved the purchase of some

14   Vicodin, as you described, correct?

15        A    Yes, sir.

16        Q    And were you present for that transaction?

17        A    Yes, sir.

18        Q    And were there civilians, other than Mr. Ellard,

19   present during that transaction?

20        A    Are you referring to co-defendants, sir, or other

21   agents?

22        Q    No, civilians, generally.  I read the affidavit.

23   There's no mention of co-defendants being present at that

24   transaction, correct?

25        A    There were co-defendants of -- correction --

1    co-conspirators present during that transaction with

2    defendant Ellard.  And there were undercover agents, and

3    then there were civilians generally in the area of where the

4    transaction occurred.

5        Q    Okay.  Okay.  Now, the co-conspirators that you

6    mentioned are not the co-defendants that were charged with

7    Mr. Ellard and present today in court, correct?

8        A    That's correct.

9        Q    Okay.  So how many of those individuals were

10   there, all of them co-conspirators?

11       A    Two -- two identified co-conspirators in that

12   transaction.

13       Q    And who were they?

14            MR. TOBIN:  Objection.

15            THE COURT:  I think --

16            MR. TOBIN:  We're concerned it may well be a

17   safety issue for the individuals involved.

18            MR. COVIELLO:  Without --

19            THE COURT:  Sustained, at this time.

20            BY MR. COVIELLO:

21       Q    I think you said there were two individuals that

22   were there?

23       A    Yes, sir.

24       Q    Okay.  And can you describe, generally, that

25   transaction, number one, where it took place?

1    A    The transaction occurred in two parts.  The first

2  occurred at Pizzeria Uno Restaurant in Revere, and then the

3  second transaction occurred in the vicinity of the

4  Blockbuster Video store in another section of Revere near

5  the -- near Wonderland.

6    Q    Okay.  How was it that Mr. Ellard got to the

7  location of that Northgate Pizzeria Uno area, as far as you

8  know?

9    A    He traveled in one of the other co-conspirator's

10  vehicles, along with a third co-conspirator.

11    Q    Okay.  So am I correct in saying that there were

12  three all together that were involved?

13    A    Yes, sir.

14    Q    It's Mr. Ellard and two co-conspirators?

15    A    Yes, sir, that's correct.

16    Q    They were all in one motor vehicle?

17    A    Yes, sir.

18    Q    And do you have the -- do you know what motor

19  vehicle that was -- the Mass. registration and everything, I

20  take it?

21    A    Yes, sir.

22    Q    Okay.  Who was driving that motor vehicle?

23    A    The driver was --

24        MR. TOBIN:  I'm going to object, again.

25        BY MR. COVIELLO:

1    Q   Let me ask it this way, if I could, please.  Was

2  Mr. Ellard driving that motor vehicle?

3    A   No, sir.

4    Q   Okay.  The driver -- let's call that driver

5  co-conspirator No. 1, okay, just to keep them straight?

6    A   Yes, sir.

7    Q   And there's a second co-conspirator.  Where is he

8  seated, or she, for that matter?

9    A   He was seated in the rear -- the right rear

10  passenger side.

11    Q   So it's the driver co-conspirator one, the front

12  passenger; defendant Ellard; and then co-conspirator No. 3

13  behind Ellard?

14    A   Yes, sir, that's correct.

15    Q   Okay.  And were all three of those individuals

16  present during the second part of the first transaction that

17  took place later on near the Blockbuster?

18    A   Yes, they -- all three were present at -- in the

19  Blockbuster lot.

20    Q   Okay.  Now, the motor vehicle that you described

21  -- or actually, that were referenced concerning this

22  transaction in Northgate in Revere, is not the Ford Focus

23  that was involved in the final transaction that you

24  described, correct?

25    A   That's correct, sir.  It is not the same vehicle.

30

```
 1        Q     And it is not the black Honda Civic that you
 2   described concerning the last and final transaction,
 3   correct?
 4        A     That's correct.
 5        Q     And those co-conspirators, were they present when
 6   the transaction was consummated between the undercover
 7   agents and Mr. Ellard?
 8        A     Yes.
 9        Q     Well, they were percipient witnesses, correct?
10        A     They were co-conspirators to the transaction.
11        Q     And percipient?  They saw the actual exchange,
12   correct?
13        A     Yes, sir.
14              MR. COVIELLO:  All right.  I would move now for
15   the identity of both of the witnesses, Judge Bowler.
16              THE COURT:  Does the government want to be heard?
17              MR. TOBIN:  No, Your Honor.
18              THE COURT:  All right.  Your question,
19   Mr. Coviello.
20              BY MR. COVIELLO:
21        Q     Could you tell -- could you identify
22   co-conspirator No. 1, please?
23        A     Co-conspirator No. 1, the driver, is defendant
24   Timothy Hurlihey.
25        Q     And co-conspirator No. 2?
```

31

```
 1        A     Co-conspirator No. 2 was Troy Brewer.
 2        Q     Okay.  Were either one of those gentlemen present
 3   during the second transaction that took place in the Home
 4   Depot?
 5        A     No, sir.
 6        Q     Okay.  Do you have any information concerning
 7   whether or not there were any firearms involved during the
 8   Northgate exchanges?  Did anyone possess a firearm, as far
 9   as you knew or as far as any of the other agents knew?  That
10   would be Mr. Ellard or co-conspirator No. 1 or
11   co-conspirator No. 2.
12        A     We have no information of that nature, at this
13   time.
14        Q     Okay.  And the second transaction took place at
15   Home Depot, correct?  Not the second half, the second
16   transaction?
17        A     Yes, sir.  The actual second transaction occurred
18   at Home Depot.
19        Q     And who was present with Mr. Ellard during that
20   transaction?
21        A     He was alone during that transaction.
22        Q     And how did he get to that locale, the Home Depot,
23   to consummate the transaction?
24        A     He drove himself there.
25        Q     What motor vehicle did he drive?
```

1      A      He had a pickup truck that he said that he had

2  recently purchased.

3      Q      Did you end up checking to see whether or not his

4  claim that he recently purchased that pickup truck was

5  accurate?

6      A      We have, and that does not appear accurate at this

7  time.

8      Q      Was it registered to him?

9      A      To either the previous owner or the current owner

10  of the vehicle, yes, sir.

11      Q      Okay.  Is there any connection between that pickup

12  truck and any of the four co-defendants that are seated here

13  today, as far as you've been able to investigate or

14  determine?

15      A      That's unknown at this time, but that portion of

16  the investigation remains ongoing.

17      Q      Okay.  Did -- do you have any information

18  whatsoever that there were any firearms on Mr. Ellard during

19  transaction No. 2 or in the motor vehicle -- the pickup

20  truck, specifically, that he was in during transaction No.

21  2?

22      A      No, that's not known, at this time.

23      Q      Now, during the course of the investigation,

24  conversations were made between the undercover agent and

25  Mr. Ellard concerning how much money he made through the

33

1    sale of contraband, correct?

2        A    Yes, sir.

3        Q    Okay.  In fact, page No. 3 of the affidavit,

4    paragraphs 8 and 9 has Mr. Ellard claiming that he made

5    between a quarter of a million and $300,000.00 per year,

6    correct?

7        A    Yes, sir, that's my recollection, if I may refer

8    to the affidavit.

9        Q    And three to four grand per week, correct?

10       A    Yes, sir.

11       Q    And he made some claim that he was going to go

12   down to Florida with the money he made, correct?

13       A    Yes, sir.

14       Q    Now, did you have any luck in trying to

15   corroborate these boastful comments concerning Mr. Ellard?

16       A    We had not yet been able to corroborate that kind

17   of income.

18       Q    You've made efforts, though?

19       A    Yes, sir.

20       Q    Okay.  You don't have any information as to

21   whether or not he owned any cars, owned any property, had

22   any bank accounts or anything along those lines, correct?

23       A    We have not yet been able to own -- correction --

24   locate the vehicles, which defendant Ellard claimed that he

25   owned, and we have not been able to locate any other assets

34

1   in his name.

2       Q    Do you have any reason to believe that it was

3   anything other than a puffing or boasting when he had met

4   the undercover agent, in the beginning of this relationship

5   that he hoped to start?

6       A    I believe that the vehicles that he referred to

7   most likely he owned and were registered under other

8   individuals' names, based on the way he explained the

9   vehicles, characterized their locations at the given time in

10  negotiation.  I have no reason to believe he derived that

11  sort of income from his drug trade.

12      Q    Matter of fact, based on your experience, which is

13  rather lengthy and impressive, would you conclude that

14  concerning the third transaction that essentially he

15  brokered the deal, if you will?  They weren't his drugs?  He

16  put the buyer and the seller together, correct?

17      A    Yes, sir.

18      Q    Evidence that he didn't have drugs or a sufficient

19  amount of cash on hand to take care of the deal himself,

20  except as a broker, correct?

21      A    Yes, sir, that would be accurate depiction of his

22  role in the third transaction.

23      Q    Okay.  Special Agent, you've testified concerning

24  the motor vehicle -- or both motor vehicles that were

25  involved in the third transaction, a black Honda Civic and a

35

1   silver Ford Focus.  There were firearms found concerning --

2   with regard -- or in these motor vehicles at the time of the

3   arrest, specifically, two firearms found in the hood of the

4   Ford Focus, correct?

5        A    Yes, sir.

6        Q    Now, is it fair to say that they were found

7   underneath the hood or in the engine compartment of the

8   motor vehicle?

9        A    Yes, sir.

10       Q    Now, when the prosecutor claimed that there was a

11  void there, did you determine whether or not that was a void

12  that appeared naturally in the motor vehicle, or something

13  that was made by a separate individual, such as a hide would

14  be in the interior of a car?

15       A    I -- sir, I believe I characterized it as a

16  natural void in the -- in the engine compartment, but it was

17  a -- it was not altered or was not a manufactured hide.  It

18  was an area of the -- where the engine compartment and the

19  hood actually joined together with the -- or hinged to the

20  car.

21       Q    Okay.  With regard to those two firearms, I assume

22  that they've been tested and prove to be working firearms,

23  correct?

24       A    The vehicle -- correction.  The firearms were

25  turned over to ATF, and they're in the process of being

36

1  subjected to a series of different tests.

2      Q    One test would be fingerprints, correct?

3      A    Correct.

4      Q    Have those tests been performed, and if so, do we

5  know the results?

6      A    Those tests remain ongoing, and we do not have the

7  results yet.

8      Q    And is that the same answer with regard to the

9  third gun that was found in the rear part of the passenger

10  seat in the black Honda Civic?

11      A    Yes, sir, that's correct.  There are no results of

12  that testing yet.

13      Q    Okay.  Do you know where the contraband was

14  located -- half of it, anyway, or at least a portion with

15  regard to the Honda, before it was taken out in the

16  transaction?

17      A    There was no contraband found in the Honda.

18      Q    Not found.  The transaction was made, correct?

19      A    Yes, sir.

20      Q    Between the undercover and one of the

21  co-defendants, correct?

22      A    Correct.

23      Q    I believe your testimony was that half the

24  contraband was in each car or thereabouts?

25      A    Yes, sir.  And those were the words of defendant

1    Ellard that the two ounces of crack cocaine had been

2    basically split in half.  So one ounce would be in one

3    vehicle, and one ounce was in another vehicle.

4         Q    Okay.  So with regard to the ounce that was

5    supposed to be in the black Honda, do you know where exactly

6    that was located prior to the transaction being consummated?

7         A    I don't believe there was an ounce actually

8    located in that vehicle.

9         Q    Okay.  So are you assuming, therefore, that -- or

10   is it your belief that both ounces were in the other motor

11   vehicle?

12        A    I believe that both ounces were represented to be

13   in the Ford Focus.

14        Q    Okay.  Do you know where they were -- where the

15   contraband was in the Ford Focus?

16        A    Under the hood of the car.

17        Q    Did you have a conversation or did one of your

18   colleagues have a conversation with Mr. Ellard after his

19   arrest?

20        A    Yes, sir.

21        Q    And at some point, did he describe that he would

22   be receiving six grams of cocaine, as a result of his

23   endeavor in putting the transaction together?

24        A    Yes, sir.  He was -- he described that he was to

25   receive six grams of crack cocaine and a portion of the

38

1   money.

2       Q    Did you have any information concerning his drug

3   use --

4       A    No.

5       Q    -- from the time the investigation started, until

6   today?

7       A    No, sir.

8            MR. COVIELLO:  One moment, please, Judge Bowler.

9            THE COURT:  Take your time.

10           (Pause.)

11           MR. COVIELLO:  That's all I have, Agent.  Thank

12  you.

13           THE WITNESS:  Thank you, sir.

14           THE COURT:  All right.  Ms. Fried?

15           MS. FRIED:  Thank you.  If I could just have a

16  moment?

17           (Pause.)

18                        CROSS EXAMINATION

19           BY MS. FRIED:

20       Q   Good afternoon, Agent Story.

21       A   Good afternoon, ma'am.

22       Q   My name is Syrie Fried, for the record.  Did you

23  do any checking regarding the ownership of the black Honda

24  Civic that Willie Hester was arrested in?

25       A    Yes, ma'am, we did.  We do have the registered

1    owner information of that vehicle.  I am not --

2        Q    And who was it?

3        A    -- aware of that information.

4        Q    You don't know who the owner of the vehicle was?

5        A    I cannot recall that at this time, no, ma'am.

6        Q    Well, was it a privately owned car or was it a

7    rental car?

8        A    It's a privately owned vehicle.

9        Q    It's a privately owned car?

10        A    Yes.

11        Q    All right.  And it was not, to the best of your

12    memory, registered in the names of any of the five people

13    who are here in court?

14        A    No, ma'am, it was not.

15        Q    Okay.  Now, and is it accurate that during the

16    course of your investigation of Adam Ellard, you had never

17    seen the black Honda Civic before?

18        A    That's correct.

19        Q    Okay.  So it was not implicated in the first two

20    transactions that you referenced earlier in your testimony,

21    correct?

22        A    Yes, ma'am, that's correct.

23        Q    And is it also accurate that Willie Hester never

24    figured as a person that was involved in either of the two

25    earlier transactions that happened in March of 2004

1    regarding Mr. Ellard?

2        A    That's correct, ma'am.

3        Q    All right.  Now, you told us that you were

4    actually in the Bickford's parking lot surveilling things

5    before everybody was arrested on April 12th, correct?

6        A    I was surveilling the lot.  I was not actually in

7    the lot.

8        Q    Oh, okay.  You were surveilling the lot?

9        A    Correct.

10       Q    Okay.  Now, can you tell the Court and tell all of

11   us how far from the black Honda Civic you were in distance

12   of feet?  What was the distance between your place of

13   surveillance and that Honda Civic?

14       A    When the Honda Civic traveled along the Toys-R-Us

15   shopping center and executed the 90 degree right-hand turn

16   to enter the Bickford's lot, the vehicle passed

17   approximately 20 to 25 feet from my location.  From that

18   point on after he parked in the lot, the vehicle was

19   approximately 35 to 40 -- correction -- 35 to 45 feet from

20   my location.

21       Q    So are you saying that after the Honda Civic came

22   to a rest, say, in the parking lot -- well, after it came to

23   a rest, your point of surveillance was this 45 feet away

24   from that car for the entire rest of the time?

25       A    For the majority of that transaction, and then at

41

1    the end, I relocated to a point which was looking at the

2    vehicle from a different perspective, but approximately, at

3    the same distance.

4        Q    Now, let me ask you this.  You told us earlier

5    that at some point Mr. Ellard got out of the undercover

6    agent's car and went over to the black Honda Civic to have a

7    conversation with Mr. Heller -- Mr. Hester; do you remember

8    telling us that?

9        A    Yes, ma'am.

10       Q    All right.  Now, I want to ask you, on what side

11   -- where was your surveillance place in relation to the car;

12   that is, what side of the car were you on?  Were you in

13   front of the car?  Were you closer to the front of the car?

14   Were you closer to the back of the Honda?  Were you on the

15   passenger side, on the driver's side?  Can you tell us where

16   your perspective was?

17       A    My perspective was basically looking at the front

18   of the Honda.  So the front of my surveillance vehicle was

19   facing the front of the -- correction.  The front of the

20   surveillance vehicle was facing the rear of the Honda Civic

21   and the front of the Ford Focus.

22       Q    Okay.  So you were, essentially -- you would be,

23   basically, parked behind the Honda Civic (u)?  Lined up in

24   the same direction, facing in the same direction that the

25   Honda Civic was in?

*APEX Reporting*
(617) 426-3077

1       A    Yes, ma'am, that's correct.

2       Q    Okay.  So -- okay.  And was your line of such that

3  you would have been looking at the rear of the vehicle and

4  through the back windshield?

5       A    Yes, ma'am, generally, looking at the -- through

6  the rear window.  However, I was off to what would be the

7  driver's side, side of the car, so --

8       Q    Slightly?

9       A    Slightly.

10       Q    Okay.  Now, let me ask you this.  At what point

11  did you -- at what point during -- in the investigation did

12  the authorities attempt a first attempt to determine the

13  ownership of the black Honda?

14       A    I'm sure as soon as the vehicle pulled into the

15  lot, the registration was run through our base operations.

16       Q    Well, I just want to be sure I understand it.  Is

17  it that you have not been able to determine the ownership or

18  that the ownership is known and you simply don't remember

19  who it is?

20       A    We know the registered owner of the vehicle.  I

21  believe the vehicle remains in our impound lot.  I am not

22  aware of the registered owner.  I cannot recall the

23  registered owner's name.

24       Q    All right.  Now, it's accurate, isn't it, that

25  when you watched this conversation taking place between

1   Mr. Ellard and Mr. Hester that you told us about, you didn't

2   see anything being passed between them, correct?

3       A    That's correct.

4       Q    Okay.  And how long did this tet-a-tet take

5   between Mr. Hester and Mr. Ellard that you saw?

6       A    The initial conversation probably took 30 to 45

7   seconds.

8       Q    Okay.  Now, and when I -- when you say the initial

9   conversation, I want to be sure you're referring to the same

10  one that I'm thinking about and that is a conversation that

11  took place after the undercover officer refused to give the

12  money to Mr. Ellard that you told us about, correct?

13      A    Yes, ma'am.

14      Q    All right.  That's the one we're -- we're both

15  talking about the same one?

16      A    That's correct.

17      Q    Okay.  Now, Mr. Ellard sold crack cocaine to an

18  undercover agent on March 9th, right?

19      A    I believe it's March 6th.

20      Q    You think it was March 6th.  Excuse me.

21          MS. FRIED:  Well, if I could just have the

22  Government's Exhibit 1.  Is this that (u) exhibit?

23          THE COURT:  Were you not provided with that?

24          MS. FRIED:  Well, I just want to use the official

25  copy that had been entered, Your Honor, if that's all right.

44

1   If I could refer you to paragraph 11 on page 3.

2           BY MS. FRIED:

3       Q    I'd like to refer your attention to paragraph 11

4   on page 3 of Government's Exhibit 1.  That is your

5   affidavit, correct?

6       A    Yes, ma'am.

7       Q    Okay.  Could you take a look at paragraph 11?

8   Does it not reference a drug transaction involving crack

9   cocaine that took place on March 9th?

10      A    Yes, ma'am.  After reviewing the affidavit,

11  refreshing my recollection, that second transaction did

12  occur on March 9th, rather than March 6th.

13      Q    Okay.  Now, and that was the transaction that

14  Mr. Ellard did by himself at the Home Depot?

15      A    Yes, ma'am, that's correct.

16      Q    Okay.  It's true, isn't it, that Mr. Ellard,

17  during the course of that transaction, claimed to be the

18  person who actually cooked the crack himself, correct?

19      A    Yes, ma'am.

20      Q    Okay.  So he was not only the source of the crack,

21  but he actually created the crack, according to him, right?

22      A    Yes, ma'am.

23      Q    Okay.  So that was not a situation where he could

24  be fairly characterized as a broker, correct?

25      A    During --

*APEX Reporting*
(617) 426-3077

1    Q    He was the principal?

2    A    During that transaction, yes.

3    Q    He was the principal, correct?

4    A    That's correct.

5    Q    All right.  And he also said that in conversation

6    leading up to and including that transaction that he'd cook

7    -- that he cooked crack; that this was part of what he did,

8    correct, as part of his business?

9    A    That's correct.

10   Q    All right.  Okay.

11        (Pause.)

12   Q    Now, the -- there were a -- you told us there were

13   numerous recorded conversations between Mr. Ellard and the

14   undercover agent who was doing this bust in the days before

15   the April 12th transaction, correct?

16   A    Yes, ma'am.

17   Q    And conversations leading up to the April 12th

18   transaction began four days before then, at least, correct?

19   A    Yes, ma'am.

20   Q    On April 8th, right?

21   A    That's correct.

22   Q    Okay.  And can you tell us approximately how many

23   conversations there were between Mr. Ellard and the

24   undercover officer, between April 8th and the time the

25   actual transaction was consummated, on April 12th?

46

1    A    I believe there were two or three conversations

2    which occurred on April 8th, and there were two or three

3    conversations that occurred during the morning of April

4    12th, at which time defendant Ellard confirmed the

5    transaction.  And then there were several conversations

6    after the undercover agent arrived at the parking lot at

7    5:00 p.m., on April 12th.

8    Q    Okay.  And it was during these -- let me ask you

9    this.  During the course of any of these conversations that

10   Ellard had, for example, on April 8th, did Ellard ever make

11   reference to somebody else who was going to be supplying him

12   with the cocaine?

13   A    No, ma'am.

14   Q    Okay.  So the tenor of those conversations that

15   happened on April 8th was that Ellard, himself, was the

16   source of the cocaine that was to be sold when the deal got

17   done eventually, correct?

18   A    Correct.

19   Q    Okay.  Ellard never, during the course of those

20   conversations, alluded to needed to see whether his source

21   or whether a source was going to be able to come up with the

22   drugs or anything else, correct?

23   A    Correct.

24   Q    All right.  Now, and you said that there were

25   about three other conversations on April 12th, before

47

1  everybody ended up meeting in the Bickford's parking lot,

2  correct?

3      A    Yes, ma'am.

4      Q    During the course of any of those conversations

5  that happened on April 12th that were monitored and

6  recorded, did Ellard ever refer to a source, other than

7  himself, who was going to be supplying the drugs that were

8  going to be part of that deal?

9      A    No, he did not.

10     Q    Okay.  So again, Ellard represented himself during

11  the course of those conversations as being the person who

12  was actually responsible for getting the drugs to the

13  transaction, correct?

14     A    Correct.

15     Q    All right.  Now, and it was Ellard who set the

16  price for the drugs, correct?

17     A    Correct.

18     Q    Now --

19          (Pause.)

20          MS. FRIED:  If I could just have one more moment,

21  Your Honor.

22          THE COURT:  Take your time.

23          MS. FRIED:  I'm almost done.  Thank you.

24          (Pause.)

25          BY MS. FRIED:

48

1      Q    Now, it's fair to say -- and I'm -- want to refer

2    you to paragraphs 24 and 25 of Exhibit 1, your affidavit.

3    It's fair to characterize Mr. Ellard's statements to you and

4    to the authorities after his arrest, as ones where he made

5    himself -- portrayed himself as being the agent of Willie

6    Hester and other people who were arrested in this case,

7    correct?

8      A    I don't --

9      Q    Well --

10     A    I don't believe that's an accurate

11   characterization.

12     Q    Well, okay.  You -- referring, specifically, to

13   paragraph 24 of your affidavit, you're -- don't you say in

14   that -- in paragraph 24 that Mr. Ellard told you after the

15   deal that he had been dealing with Hester to do the deal and

16   that it was Hester who was to be providing him with the

17   drugs, right?  Isn't that what he basically tells you in

18   paragraph 24 of your affidavit?

19     A    That's correct.

20     Q    Okay.  So he -- and he also tells you in the -- in

21   that paragraph of the affidavit that what he's taking is

22   payment for his role in this is six grams of crack that he's

23   going to break off from a certain amount that's to be made

24   part of the deal, correct?

25     A    That's correct, along with a balance of cash,

*APEX Reporting*
(617) 426-3077

1    which would be the difference between the negotiated price

2    to the undercover and the price of the crack cocaine, which

3    allegedly had been quoted by defendant Hester.

4         Q    Okay.  So he was going to take some commission and

5    a certain amount of drugs?  That's what he told you?

6         A    Yes, ma'am.

7         Q    Okay.  That was his version of his role, right?

8         A    That's correct.

9         Q    Okay.  So basically, it's fair to say that he was

10   painting himself as an employee of other people who were

11   supplying the drugs and that he was simply taking a salary,

12   in terms of a little bit of money and some crack for

13   brokering the deal, correct?

14            MR. TOBIN:  Objection, Your Honor.  She's

15   essentially making an argument asking the witness to agree.

16   He stated the facts as he understands them, beyond that, it

17   would be for the attorney to make the argument to the Court.

18            THE COURT:  You can rephrase the question.

19            MS. FRIED:  I'll try to, Your Honor.

20            BY MS. FRIED:

21        Q    Now -- if I could just have a moment.

22             (Pause.)

23        Q    Well, referring again to paragraph 24.

24        A    Yes, ma'am.

25        Q    Ellard's version was that it was Hester who knew

```
 1  where the drugs were going to be, correct?

 2       A    Correct.

 3       Q    Okay.  It was Ellard's version that other people

 4  were bringing the drugs to the transaction, right?

 5       A    Correct.

 6       Q    And it was Ellard's version that he basically

 7  didn't know where the drugs were going to be, until Hester

 8  told him where the drugs were going to be, right?

 9       A    Correct.

10       Q    Okay.  So this was certainly not a situation where

11  he was taking responsibility for producing the drugs

12  himself, like he had in the earlier transaction that was

13  done on March 9th, right?

14       A    This third transaction was -- correct -- different

15  than the second transaction, in which the second transaction

16  being accurately characterized where defendant Ellard

17  directly distributed the drugs.  The third transaction, I

18  can most accurately characterize as defendant Ellard was the

19  broker of the deal with the other defendants being the

20  source of supply.

21       Q    Well, that's certainly consistent with what he

22  told you, correct?

23       A    It's also --

24       Q    Well --

25       A    -- consistent with my training and experience, as
```

51

1    to --

2        Q    Yes, it is.

3        A    -- what occurred.

4        Q    It is -- it is consistent with what he told you

5    what his role was, correct?

6        A    It's consistent with what both the defendant told

7    me and what I observed transpire and what I know from

8    monitoring the undercover agent's body transmissions -- body

9    wire transmissions.

10            MS. FRIED:  Just a moment, Your Honor.

11            THE COURT:  Take your time.

12            (Pause.)

13            BY MS. FRIED:

14        Q    Now, you said that Willie Hester, among all the

15    other people, were -- they were all searched incident to

16    arrest afterwards, correct?

17        A    Yes, ma'am.

18        Q    All right.  And it's accurate, isn't it, that

19    there was no significant amount of money found on

20    Mr. Hester's person, if any money at all was found, right?

21        A    That's correct.

22        Q    Okay.  And no drugs were found on Mr. Hester's

23    person, correct?

24        A    That's correct.

25        Q    Okay.  What was found that was contraband at the

1    -- in the Honda was a gun in the back -- in a pocket on the

2    back of the passenger seat, correct?

3       A    Correct.

4       Q    All right.  And when this car came into the

5    parking lot, Mr. Hester was not in the backseat of the car,

6    right?

7       A    No, ma'am.

8       Q    He was in the driver's seat, correct?

9       A    That's correct.

10      Q    Okay.  And that was the only place where he was

11   ever seen in that car by you or anybody else surveilling it

12   -- this incident, correct?

13      A    That's correct.

14      Q    Okay.  So he wasn't seen in the passenger seat,

15   right?

16      A    No, ma'am.

17      Q    Okay.  And he was never seen to be doing anything

18   with the -- with the pocket of the passenger seat, correct?

19      A    Correct.

20      Q    Okay.  So whether or not he had access to that

21   pocket, he was never seen making access to that pocket,

22   right?

23      A    Although, the weapon was within his direct reach,

24   he was not seen reaching into that pocket at any time.

25      Q    Okay.  And he's not seen reaching in or putting

53

```
 1   anything in or taking anything out, correct?

 2        A    Yes, ma'am.

 3             (Pause.)

 4             (Phone ringing.)

 5             (Pause.)

 6             MS. FRIED:  Nothing further.

 7             THE COURT:  All right.  Mr. Cox?

 8             MR. COX:  Thank you, Your Honor.

 9                      CROSS EXAMINATION

10             BY MR. COX:

11        Q    Good afternoon, Agent Story.

12        A    Good afternoon, sir.

13        Q    I'm Roger Cox.  I represent Tavon Robinson.

14        A    Yes, sir.

15        Q    In the first two transactions you describe with

16   Mr. Ellard, Mr. Robinson had absolutely no involvement; is

17   that true?

18        A    Yes, sir, that's correct.

19        Q    Okay.  In the numerous phone calls that took place

20   before the actual meeting on April 12th, his name was never

21   mentioned; is that true?

22        A    Yes, sir, that's true.

23        Q    Okay.  Now, did you physically see Mr. Robinson

24   open the hood of the Focus slightly, as you testified?

25        A    Yes, sir.  I observed that, and other agents and
```

54

1    officers, including the undercover agent, observed that.

2         Q    And you saw the natural void you describe, where

3    the two handguns were located, yourself?

4         A    I did not.  It was described to me, subsequently,

5    when the weapons were seized.

6         Q    All right.  But you're still familiar with the

7    geometry of what's under the hood of that car; is that a

8    fair statement?

9         A    Yes, sir.

10        Q    Okay.  By opening the hood only slightly to

11   retrieve the alleged drugs, would it have been possible for

12   Mr. Robinson, from that vantage point, to have seen those

13   guns inside the vehicle, in that void you describe?

14        A    He would not have seen the guns from the area that

15   the drugs were apparently concealed under the hood.

16        Q    Did you see the drugs which were the focus of this

17   transaction, yourself; see inside the package; see their

18   physical form?

19        A    Yes, sir.

20        Q    Was it a rock-like substance or was it powder?

21        A    It's a rock-like substance.

22             MR. COX:  That's all I have.  Thank you.

23             THE COURT:  Next?

24             MR. FEINBERG:  Thank you, Judge.

25             THE COURT:  You're welcome.

CROSS EXAMINATION

BY MR. FEINBERG:

Q    Good afternoon, Agent.  Matthew Feinberg
representing Mr. Tucker.  Following up on what Mr. Cox said,
I take it it's also true that there was no involvement of
Mr. Tucker in the first two transactions and no comments
about him in any of the wired conversations, prior to April
12th?

A    Yes, sir, that's correct.

Q    Okay.  First time he comes on to your radar screen
is when somebody -- when he's in that car in the parking lot
that day; is that correct?

A    Yes, sir, that's correct.

Q    Now, I want to just try to focus a little bit
about viewing in my mind's eye, the picture of where
everyone was that afternoon.  It's a parking lot; am I
correct?

A    Yes, sir.

Q    And it's a parking lot with double lines of cars,
so that there are isles for the cars to drive back and
forth; is that a fair statement?

A    Yes, sir.

Q    And you say that you -- were you backed into a
space, so that you're facing the isle or facing into the
line of cars adjacent to your line of cars?

56

```
 1        A    I was observing the parking lot from the gas

 2   station, which overlooks the lot.

 3        Q    I see.  So you weren't even in a car?

 4        A    I was parked in a vehicle that was in the gas

 5   station -- behind the gas station, which overlooks the

 6   parking lot where the defendants conducted the deal.

 7        Q    So you -- you -- your car, the car that you were

 8   in, was not in a -- in one of the lines of cars in the

 9   parking lot; is that correct?

10        A    That's correct.

11        Q    Was it by yourself, your car?

12        A    Yes.

13        Q    And it's facing the parking lot, generally?

14        A    Yes, sir.

15        Q    And did you move, once you saw the black car come

16   into the lot?

17        A    No, sir.

18        Q    You stayed exactly where you were?

19        A    Yes, sir.

20        Q    And the black car came right by you?

21        A    Yes, sir.

22        Q    Okay.  And did it -- what -- in relation to your

23   car, is -- oh, I'm sorry.  Strike that.  The back of your

24   car is closest to the gas station; is that true?  That is,

25   to say you're not facing the gas station, are you?
```

57

```
 1      A      No, sir.

 2      Q      Okay.  You're facing the parking lot?

 3      A      Yes, sir.

 4      Q      Were you in the passenger's seat or in the

 5  driver's seat or in the backseat?

 6      A      Passenger seat.

 7      Q      And you were accompanied by other agents?

 8      A      Yes, sir.

 9      Q      Who was the agent who was driving the car?

10      A      Special Agent Kevin Sawyer.

11      Q      Okay.  And were there any other agents in the car?

12      A      No, sir.

13      Q      Were there any other agents in other cars, at that

14  time?

15      A      Yes, sir.

16      Q      How many other agents and where were they?

17      A      There were approximately 14 to 16 other agents

18  positioned virtually all around the perimeter of the lot.

19      Q      Okay.  How many cars did that represent?  They --

20  were they all on cars or were they on foot?

21      A      There were two individuals on foot.  The rest of

22  the agents and officers were in vehicles.

23      Q      And were they parked in various locations within

24  the parking lot?

25      A      Yes, sir.
```

1    Q    Was your car closest to the eventual location of

2    this Honda Civic, when it finally parked?

3    A    I believe -- I may -- I was closest.  But without

4    actually going out and, again, surveying the location of the

5    lot, it could have been possible one of the other

6    surveillance agents was actually closer to the vehicle when

7    it parked.

8    Q    Did you have conversations with anyone else, as to

9    what their angle of vision was, after the fact?

10   A    No.  I recall how I placed the vehicles, when I

11   was setting up the surveillance team.

12   Q    Now, when the black Honda finally parked, it

13   parked in one of the isles facing in the normal way; that is

14   to say, facing -- with it's hood facing the hood of the car

15   in front of it; is that correct, if there was a car there?

16   A    There was no car in front of it, parked --

17   Q    Okay.

18   A    -- with its hood or front of the car facing the

19   restaurant.

20   Q    Okay.  And the Ford, where did it park,

21   originally?

22   A    The -- when the Ford came to park -- and that was

23   the only place it parked -- it parked about one parking spot

24   away from the Honda Civic in the same row; however, facing

25   in the opposite direction.

1    Q    Was there a car in between the two cars?

2    A    No, sir.

3    Q    Was there a space in between the two cars?

4    A    Yes, sir.

5    Q    So there's an empty space between the two -- one

6 empty space between the two cars?

7    A    Yes, sir.

8    Q    And they were, at that point, facing in the same

9 direction?

10    A    No, sir.

11    Q    They were not facing in the same direction?

12    A    The Honda Civic was facing the restaurant, and the

13 Ford was facing the opposite direction.

14    Q    Does that mean that they were in different rows;

15 that is to say, if I could -- you don't have a --

16    THE COURT:  We don't have a black board.  I'm

17 sorry.

18    MR. FEINBERG:  -- blackboard or anything.  Maybe I

19 could just use a piece of paper and --

20    THE COURT:  Certainly.

21    BY MR. FEINBERG:

22    Q    Sir, why don't you, if you don't mind -- and this

23 is all obviously just an approximation -- place the primary

24 landmarks -- the gas station, the Toys-R-Us, the rows of

25 cars and where your car was, in relation to the two cars

60

1  that came into the lot.

2       A    Of course, this sketch, again, not being to scale.

3  I'm going to first draw the Bickford's Restaurant.

4       Q    Why don't you take a minute and do the best you

5  can.  We all understand that you are not Picasso here.

6            THE COURT:  You may have an undiscovered talent.

7            (Laughter.)

8            (Pause.)

9            BY MR. FEINBERG:

10       Q    Are you all set?

11       A    Yes, sir.

12       Q    All right.  (U)

13       A    (U) one correction.

14            (Pause.)

15       Q    I'm sorry.  What does that say?

16       A    UC, for undercover vehicle.

17       Q    Okay.

18       A    I wanted to clarify that.

19       Q    And where are you located?

20            (Pause.)

21       Q    Now, you're also drawing in here the isles, the

22  dotted line, where -- which are in between the rows of

23  parked cars, just so we're clear on whether there are --

24       A    The travel isles or actually parking spaces you're

25  referring to, sir?

1       Q    I'm actually -- well, let's start with the isles,

2    and then if you could do the parking spaces, as well.

3           (Pause.)

4       A    Again, I believe their oriented in this fashion,

5    because that's generally the manner in which the cars were

6    parking in the lot.  I don't recall the lines being painted

7    on the ground.  However, I'm approximating the space between

8    the two subject vehicles was approximately one parking

9    space.  I'm going to draw that as a parking space and

10   continue approximating the lines.

11      Q    And could you do that to the point, is there

12   another set of -- row of parking spaces below where you've

13   drawn in the Honda and the Ford?

14      A    I don't believe so.  I'm not aware of a third row.

15      Q    Are you sure of that?

16      A    No, sir, I'm not sure, because I haven't -- I

17   haven't surveyed the -- the lot for the layout of the

18   parking spaces.

19      Q    So just to see if I can review this -- and I'm

20   happy to show this to the Court, Your Honor.  But I think

21   the best way to do it would be to sort of have him verbally

22   review this.  But you're at a gas station -- behind a gas

23   station; am I correct?

24      A    Yes, sir.

25      Q    And you're looking out your right-hand side --

62

```
1        A    Correct.

2        Q    -- correct?  And to your right-hand side, there

3   are rows of car -- of parking spots -- spaces behind the

4   Bickford's; is that correct?

5        A    Yes, sir.

6        Q    And do you recall whether or not there are lots of

7   cars, a small number of cars or no cars in the lot?

8        A    There were very few cars on that side of the lot

9   --.

10       Q    Did you take photographs that day?

11       A    No, sir.

12       Q    When the two cars came into the lot, did they --

13  you say they parked with one empty space between them; am I

14  correct?

15       A    Yes, sir.

16       Q    Facing in opposite directions; am I correct?

17       A    Yes, sir.

18       Q    That is to say, the Honda Civic facing in the same

19  direction you were and essentially, parallel to you, but in

20  front of you; is that correct?

21       A    That's correct.

22       Q    And the Ford facing in the opposite direction;

23  that is to say, facing in your direction, but -- well, in

24  the opposite direction; am I correct?

25       A    Yes, sir.
```

63

1    Q    And the undercover vehicle is facing in the

2  opposite direction of the Ford; am I correct?

3    A    Yes, sir.

4    Q    All right.  But it's in a different row of parking

5  spaces; am I right?

6    A    Yes, sir.

7    Q    So that there's an isle between them, so cars can

8  go back and forth?

9    A    Yes, sir, that's correct.

10    Q    Now, at some point, the -- which car moves, or is

11  it already moved in this diagram?

12    A    The only vehicle which moves is the undercover

13  vehicle.

14    Q    And had it already moved, when you -- as you draw

15  this diagram?

16    A    No, sir.

17    Q    When it moves, where does it move to -- verbally?

18  And then I'll have you put it in the picture.

19    A    There's a fence which runs along the back of

20  Bickford's, separating it from the loading dock area of

21  Toys-R-Us.  So it backs away -- correction.  This picture

22  shows the initial placement of the vehicles.  At a certain

23  stage of negotiations, at the request of defendant Ellard,

24  the vehicle backs up in -- into the row of cars --

25  correction -- row of parking spaces, which would actually

64

1   mean there is another row of parking spaces, because it

2   comes trunk-to-trunk with the Ford Focus.

3       Q    So you're saying that this diagram is mistaken and

4   there should be a second -- two isles between the two cars

5   -- between the undercover vehicle and the two other cars?

6       A    I believe so, because when he backed up, he wasn't

7   blocking the traffic way there.  So in all likelihood,

8   there's a second row of --

9       Q    Can you just -- so we won't mess this thing up,

10  can you just say that that's two isles there?  Is that a --

11  would that be a fair statement?

12      A    Yes, sir.

13      Q    That is to say, that there are two isles, and

14  there's another set of parked cars; am I correct, that are

15  in between the undercover car and the two cars that have

16  pulled into the lot?

17      A    Yes, sir.  I'm making a notation that this would

18  actually represent two isles of parking.  Because after the

19  -- after the undercover vehicle backs up from its original

20  location, as it's drawn here, it parks trunk-to-trunk with

21  the Ford Focus.

22           MR. FEINBERG:  Okay.  Anybody wants to see this?

23           (Pause.)

24           MR. FEINBERG:  Can I have this marked, Your Honor?

25           THE COURT:  Yes.  It will be marked as Defendant's

65

1    Exhibit A for the purpose of this hearing.

2                               (Defendant's Exhibit No. A was

3                               marked for identification.)

4            BY MR. FEINBERG:

5        Q    Now, as I understand you, while you were in your

6    car seeing -- watching the situation, you're at the same

7    time able to monitor the conversations, at least insofar as

8    the undercover agent is concerned; am I right?

9        A    Yes, sir.

10       Q    So that you're able to monitor the conversations

11   between the undercover agent and Mr. Ellard, when he comes

12   over to the car?

13       A    Yes, sir, and other points of the conversation.

14   I'm able to monitor all conversation in which the undercover

15   agent participates in, which would include the conversation

16   at the end that the undercover agent had with all --

17   additionally, defendant Robinson.

18       Q    Because Robinson comes over to where the

19   undercover agent's car is?

20       A    Yes, sir.

21       Q    Okay.  So effectively, you're able to hear what

22   happens in, at or inside the undercover agent's car?

23       A    Yes, sir.

24       Q    The undercover agent never leaves his car, does

25   he?

66

```
 1        A    That's correct.

 2        Q    You don't hear any of the conversations that go

 3   on, when Ellard goes over to the Ford; am I correct?

 4        A    That's correct, sir.

 5        Q    And in fact, there is no monitoring of those

 6   conversations?

 7        A    No, sir.

 8        Q    And you don't even know who he was talking to,

 9   when he goes over to the car, do you?  I mean, he could have

10   been talking to all three individuals or two or one; is that

11   correct?

12        A    He appeared to be talking to all three vehicles by

13   the --

14        Q    Well, he's -- he -- the window is down; am I

15   correct?

16        A    Yes, sir.

17        Q    And in fact, there's somebody or some -- several

18   people in the car?

19        A    I observed the defendant talk, move his head and

20   what would appear to me to be engaged in conversation with

21   -- with all parties and not focused on one particular party.

22        Q    And how -- do you know that by virtue of the

23   movement of his head?

24        A    Yes, sir.

25        Q    Okay.  The movement of his head, meaning he turned
```

1    to somebody in the backseat?

2        A    Yes, sir.

3        Q    And he turned to somebody in the driver seat?

4        A    Between the front and the backseat.

5        Q    And other than that, you have no other evidence of

6    it -- as to who he's talking to?

7        A    Other than the defendants' post-arrest statements,

8    no, sir.

9        Q    You mean, Mr. Ellard's post-arrest statements?

10       A    Correct.

11       Q    I'm now focused at the time.  At the time this is

12   going on, you have no other evidence of who else he's

13   talking to?

14       A    No, at that point, there was no further evidence.

15       Q    Okay.  And I gather you -- I think you testified

16   to this, but let me make sure -- make sure.  Mr. Tucker

17   never leaves his seat; am I correct?

18       A    That's correct, sir.

19       Q    He stays in the passenger seat of his car -- of

20   that car, correct?

21       A    Yes, sir, he does.

22       Q    And even at the time of his arrest, he doesn't try

23   to flee; am I correct?

24       A    That's correct.

25       Q    He's arrested, as he sits in that car?

1     A    That's correct.

2     Q    And you have no monitored conversations of

3 Mr. Tucker?

4     A    Correct.

5     MR. STEINBERG:  Thank you.  I have nothing else.

6     THE COURT:  Mr. Shapiro?

7                 CROSS EXAMINATION

8     BY MR. SHAPIRO:

9     Q    Good afternoon, Agent Story.  My name is Jonathan

10 Shapiro, and I represent Norman Barnes.

11     A    Good afternoon, sir.

12     MR. SHAPIRO:  Do we have that map?

13     THE COURT:  We do, and we don't have Government's

14 Exhibit 1.  It was not returned to us.

15     MS. FRIED:  Oh, I beg your pardon, Your Honor.

16     (Pause.)

17     MS. FRIED:  I apologize.

18     BY MR. SHAPIRO:

19     Q    Now, Agent Story, I'm correct, am I not that prior

20 to this incident on April 12th, Mr. Barnes was never

21 observed in connection with any transactions with

22 Mr. Ellard?

23     A    That's correct.  He was not, sir.

24     Q    Okay.  And on none of the telephone conversations

25 between Mr. Ellard and the undercover agent or anybody else,

69

1    Mr. Barnes' name never came up, correct?

2        A    That's correct, sir.

3        Q    So the first time that Mr. Barnes was observed in

4    connection with this investigation you say was on April

5    12th?

6        A    Yes, sir.

7        Q    And over what period of time did this

8    investigation take place?

9        A    The investigation, which focused primarily on

10   defendant Ellard began in early March and resulted in the

11   arrest of the defendants on April 12th.

12       Q    So over this month, plus period, the only time

13   that Mr. Barnes was ever observed or his name ever came up

14   was on April 12th; is that correct?

15       A    As of this time, yes, sir, that's correct.

16       Q    When you say as of this time, are you saying the

17   investigation is still ongoing?

18       A    Yes, sir.

19       Q    And but as of this time, April 12th is the first

20   time there was any -- Mr. Barnes ever came up?

21       A    Yes, sir.

22       Q    And do you know who is who of these gentlemen

23   sitting -- seated here in the jury box?

24       A    Yes, sir.

25       Q    And Mr. Barnes is which one?

70

1      A     Defendant Norman Barnes is seated all the way to

2   my left in the jurors' box.

3      Q     And you participated in his arrest on April 12th?

4      A     Yes, sir.

5      Q     Now, just so I understand from this map that

6   you've drawn, was this just a Bickford's parking lot, or was

7   this something like a mall with other -- where you've

8   indicated the Toys-R-Us is on one side of this map and then

9   you have the Bickford's.  But were there other stores in --

10  along the side of Bickford's, besides the Toys-R-Us?

11     A     No, sir, and if I could either point out or

12  further depict.  The front -- the entrance to the Toys-R-Us

13  would actually be off the lower margin of the page here.

14  The rear, near where the defendant's exhibit sticker is

15  would be the loading dock, and there are no other business

16  connected to this plaza.  So the individuals who -- the

17  patrons of Toys-R-Us would park generally in -- in this

18  area, if we expanded this paper.  Individuals traveling to

19  the gas station would park in this area.  And generally,

20  this lot would be limited to those using Bickford's or the

21  public telephone area.

22     Q     Okay.  And is where you have the public telephones

23  at the front of the Bickford's -- the entrance to the

24  Bickford's or is this the rear of it?

25     A     Actually, that's a side, I believe.  You have to

71

1   access it from the front.

2       Q    Which -- well, all right.  Do you know which is

3   north and south?

4       A    Generally, if the Southeast Expressway travels

5   truly south here, then I could accurately depict it.

6       Q    Well, what's your best -- just so we can identify,

7   would you just put an arrow pointing north?

8            (Pause.)

9       A    Probably not magnetic north, but it's oriented.

10      Q    So with that as a point of reference, what

11  direction, what side of the Bickford's, in terms of

12  direction would be the in?

13      A    Most -- most likely, would be the west side.  I

14  haven't entered that Bickford's.  I believe the entrance is

15  right on the corner.

16           (Indicating.)

17      Q    You're pointing -- you're pointing here?

18      A    Yes, sir.

19      Q    That would be the east side, wouldn't it?

20           (Pause.)

21      A    Yes, sir.

22      Q    Is that east?

23      A    That's correct.

24      Q    West?

25      A    Yeah.

72

1    Q    And south?

2    A    Looking at it upside down.

3    Q    Okay, all right.  So the entrance is on the east

4  side, and this parking lot is in the rear of the -- or on

5  the side of the Bickford's?

6    A    Yes, sir.

7    Q    And the gas station, is that gas station on any

8  street?

9    A    No, sir.  It's just an -- I believe it's just

10  referred to as an access road that feeds into the Southeast

11  Expressway.

12    Q    And on which side of the gas station is that

13  access road, the east side?

14    A    Yes, sir.

15    Q    And so you were parked on the west side of this

16  gas station, up against -- is this a building that's

17  designed -- that you've drawn as a square?

18    A    Yes, sir.

19    Q    And so you were up against the building?

20    A    Generally, yes, sir.

21         (Pause.)

22    Q    And the other agents that you mentioned -- there

23  were 14 to 16 agents, all but two, of whom were in vehicles.

24  In fact, how many vehicles would you say that there were --

25  seven vehicles, six vehicles?

73

1        A    Yes, sir, seven to eight vehicles.

2        Q    And they were parked in the perimeter of this

3    Bickford's lot?

4        A    Yes, sir.

5        Q    Was there any video surveillance conducted during

6    this incident?

7        A    No, sir.

8        Q    And there were no photographs taken during the

9    incident?

10       A    No, sir.  It was too dark, at that point.

11       Q    What time of day was it?

12       A    The transaction began to take place around 7:30

13    and --

14       Q    And so it's -- it's dark?

15       A    Yes, sir.

16       Q    Now, you're seated -- were you seated at the

17    passenger side of the -- of the undercover vehicle that you

18    were in?

19       A    Yes, sir.

20       Q    Now, I know in response to questions by Ms. Fried

21    that I think you indicated that you were facing directly

22    toward the Honda, slightly to the left, or it was slightly

23    on the driver's side?

24       A    Yes, sir.

25       Q    On this -- on this -- this map here, Exhibit A,

*APEX Reporting*
(617) 426-3077

1   does this correctly represent the angle that you were facing

2   the Honda?

3       A    It's a close approximation, if -- if I were to

4   slightly relocate my vehicle to the right, it may better

5   define where I was seated.

6       Q    And you say this is a good approximation?

7       A    Yes, sir.

8       Q    And between where your car is parked and the --

9   the rank of cars in which both the Honda and the Focus were

10  parked, how many isles of parking were there?

11      A    I don't recall there being any -- another row of

12  parking in this area.  And if -- if there is, there were no

13  vehicles parked there, so that's what is giving me an

14  unclear reference.  So we were looking across an open lot to

15  where the defendants' two vehicles were parked.

16      Q    Okay.  And I believe you said that you were parked

17  approximately 35 to 45 feet away from the Honda?

18      A    Yes, sir.

19      Q    And that would mean you'd be another 10 to 20 feet

20  away from the Focus?

21      A    Yes, sir.

22      Q    So we're talking, let's say, 45 to 65 feet away

23  from the Focus?

24      A    Yes, sir.

25      Q    And your line of vision is -- for the Focus,

1    you're looking at the Focus, sort of, from the front to the

2    passenger side?

3        A    Yes, sir, that's correct.

4        Q    And I believe that you testified that at some

5    point, you see Mr. Ellard go to the Focus?

6        A    Yes, sir.

7        Q    And from your vantage point, you're looking at

8    Mr. Ellard's back, as he leans into the passenger side

9    window?

10        A    Yes, sir.  I'm primarily looking at his right side

11    and -- and a portion of his back.

12        Q    Well, if these -- if this map is accurate and

13    you're -- you're looking primarily at his back, aren't you,

14    if he is leaning into that car?

15        A    I could see both of his entire right side of his

16    body and a portion of his back from this vantage point.

17        Q    And from your vantage point, recognizing that it's

18    dark, you really can't see the occupants of that vehicle,

19    can you?

20        A    At this point, I can't see the occupants as clear

21    as I could when they drove right by my position to gain that

22    parking space.

23        Q    I mean, it's 7:30 at night in April -- on April

24    12th.  It's dark.  You (u) to take pictures from 60 feet

25    away, you're not telling me that you could see the occupants

1  of -- sitting inside this vehicle?

2      A    I can see that the car is still occupied in the

3  same manner as which -- as when it drove --

4      Q    I didn't --

5      A    -- passed closely by my position.

6      Q    I know.  You didn't see anybody leave the car is

7  what you're saying?

8      A    Right.

9      Q    From looking at the car from this vantage point,

10  you didn't see any of the occupants' lips moving, did you?

11      A    No, sir.

12      Q    And you can't tell us that any of those occupants

13  were talking to Mr. Ellard, can you?

14      A    I can't observe the -- any -- anything other than

15  the head movement of defendant Ellard, at that point --

16      Q    Right.

17      A    -- and that there are -- that the vehicle remains

18  occupied in the same fashion as when it drove by me.

19      Q    And so you can't tell us when you see Mr. Ellard's

20  head moving whether he was shaking his head in the negative

21  or nodding his head in the affirmative, can you, as opposed

22  to talking to somebody at any particular point, can you?

23      A    It appears as though -- it appeared as though

24  defendant Ellard was engaged in conversation.  I wouldn't be

25  able to discern if it -- if his physical gestures were

77

1    nodding in the affirmatively or anything other than he

2    appeared to be engaged in conversation.

3        Q    Well, you say appeared to be engaged in

4    conversation, but that's only because he stuck his head in

5    the car, correct?  You couldn't tell whether his lips were

6    moving, could you?

7        A    I couldn't observe his -- his lips.  The defendant

8    Ellard remained at the car for a significant period of time

9    --

10       Q    So --

11       A    -- leaning in, which would give the overall

12   appearance of remaining engaged in a lengthy conversation.

13       Q    So you're -- so you're assuming that he was

14   talking, but you didn't hear anything?

15       A    I believe that he was talking during the time he

16   was standing there.

17       Q    You believe it, but that's an assumption, because

18   -- because you didn't see his lips moving, did you?

19       A    I didn't see his lips moving.  Again, based on my

20   training and experience as an agent and surveillance, but

21   also just through general day-to-day conduct --

22       Q    Common sense.

23       A    -- common sense.

24       Q    Common sense, you're saying.  And that's an

25   assumption based on common sense?  You don't like the word

1   'assumption'?

2       A     That's correct, sir.

3       Q     But it is an assumption based on your common sense

4   and you're experience?

5           MR. TOBIN:  Objection.  He's made his point.  The

6   witness has stated what he saw, what he believed.

7           THE COURT:  All right.

8           BY MR. SHAPIRO:

9       Q     But you do acknowledge that you didn't see

10  anybody's lips moving, either Ellard or anybody, in response

11  to anything that Ellard may have been saying?

12      A     Yes, sir, that's correct.

13           (Pause.)

14      Q     Now, at some point after all of the defendants

15  were arrested and you say that you moved the vehicle to some

16  -- the Focus to some other location?

17      A     Yes, sir.

18      Q     What location?

19      A     The vehicle was moved to the Old Colony State

20  Police Barracks, in South Boston.

21      Q     Okay.  And at that point, the vehicle was

22  searched; is that correct?

23      A     No, sir.  The vehicle was secured and subsequently

24  searched.

25      Q     Well, when you say secured, what do you mean by

1    that?

2         A    The vehicle was put in the rear of the impound

3    lock -- lot, locked, and the search was subsequently

4    conducted that evening.

5         Q    And how much time later?

6         A    Probably 45 to 50 minutes later.

7         Q    Did you have a warrant?

8         A    No, sir.

9         Q    No search warrant to search the vehicle?

10        A    No, sir.

11        Q    And you searched under the hood, at this time,

12   correct?

13        A    Yes, sir.

14        Q    And what was your authority for that search?

15        A    I directed the search as a -- under the motor

16   vehicle exception, based on the transaction having just

17   occurred.  The motor vehicle exception to the vehicle being

18   the conveyance involved.

19        Q    That is, the motor vehicle exception which says

20   that a motor vehicle can often be removed from the scene and

21   therefore, there's a justification to search it; is that it?

22             MR. TOBIN:  Objection.  He's asking, essentially,

23   a legal question.  He should be asking --

24             THE COURT:  All right.  Sustained.

25             MR. TOBIN:  Thank you.

*APEX Reporting*
(617) 426-3077

80

BY MR. SHAPIRO:

1

2    Q    Was any attempt made to get a warrant for the

3    vehicle?

4    A    No, sir.

5         (Pause.)

6    Q    Did you, at any point, prepare a report concerning

7    this incident?

8    A    No, sir.

9    Q    Is the only thing you prepared, this affidavit?

10   A    Yes, sir, that's correct.

11   Q    And what about your DEA-6?

12   A    Other agents in the Met Team had prepared or are

13   preparing those reports.

14   Q    Okay.  And have you reviewed any of these DEA-6

15   reports, prior to your testimony today?

16   A    No, sir, I have not.

17   Q    Did you -- did you keep notes or take notes of any

18   of these transactions or this incident?

19   A    No, sir.

20   Q    During the entire period of time that you've

21   testified about, you didn't make any notes or take down any

22   license plates or commit any observations to paper?

23   A    No, sir.  Those notes were taken by my partner,

24   the driver of the vehicle, whom I previous identified as

25   Special Agent Kevin Sawyer, while I was monitoring the

81

1   undercover officer's communications and directing the

2   communications of the surveillance through my radio.

3        Q    Have any transcripts of these communications been

4   prepared?

5        A    Are you referring to the undercover conversation?

6        Q    Yes.

7        A    No, sir, not yet.

8             (Pause.)

9        Q    Your partner did take notes; is that correct?

10       A    That's correct.

11       Q    Okay.  And your partner has preserved his notes, I

12   take it?

13       A    Yes, sir.

14       Q    And will preserve it?

15       A    Yes, sir.

16            (Pause.)

17       Q    Now, on the basis of your observation on -- on

18   this date; that is, your observations prior to any arrest,

19   Mr. Barnes, for all you know, was the passenger of that car

20   and knew nothing about what was going on?

21            MR. TOBIN:  Objection.  Calls for speculation, but

22   asking for a factual answer.

23            THE COURT:  Rephrase it.

24            BY MR. SHAPIRO:

25       Q    On the basis of your personal observations prior

1  to the arrest it's fair to say, is it not, that Mr. Barnes

2  did not make any incriminating statements in the course of

3  your observations or any recordings, correct?

4      A    That's correct.

5      Q    You didn't see any contraband on his person, did

6  you?

7      A    That's correct.

8      Q    And you didn't see him come into contact with any

9  contraband, did you?

10     A    That's correct.

11     Q    There was nothing connected with this transaction,

12 in terms of the vehicles, in terms of the weapons that is

13 connected, in any way, to Mr. Barnes, correct?

14     A    No, sir, that's not correct.

15     Q    What was connected to Mr. Barnes?

16     A    There are -- there is documentary evidence that

17 was seized from --

18     Q    No, no.  I asked you on the basis of your

19 observations whether you saw, heard anything connected to

20 Mr. Barnes?

21     A    I have been made aware of documentary evidence

22 that was seized from the Honda Civic, which directly relates

23 to Mr. Barnes, which would either indicate that he had

24 previously been a passenger in the Honda Civic or was

25 somehow associated with the ownership of that vehicle.

1    Q    But didn't you testify you didn't even know who

2    the owner of the vehicle was?

3    A    I don't recall who the registered owner of the

4    vehicle -- but I did --

5    Q    All right.  So he's -- he's not the registered --

6         THE COURT:  Let him finish, Mr. Shapiro.

7         BY MR. SHAPIRO:

8    Q    He's not the registered owner, is he?

9    A    No, he's not.

10   Q    So again, on the basis of your observations with

11   respect to this incident, you didn't see Mr. Barnes do or

12   say anything, which connects him to this transaction, did

13   you, other than his mere presence?

14   A    I don't believe that's an accurate statement.

15        MR. SHAPIRO:  I have no further questions.

16        THE COURT:  Redirect?

17        MR. TOBIN:  Briefly, if I may, Your Honor.  Thank

18   you.

19        THE COURT:  Thank you, Mr. Shapiro.

20                   REDIRECT EXAMINATION

21        BY MR. TOBIN:

22   Q    Special Agent Story, Attorney Shapiro asked you or

23   you made reference during one of your answers to a question

24   about documentary evidence found in the Honda, potentially

25   related to Mr. Barnes -- defendant Barnes.  Could you please

1  explain that for us?  What was actually found in the Honda?

2      A    There -- there were several documents found in the

3  Honda, which I have not yet reviewed.  However, some of

4  those documents have --

5          MR. SHAPIRO:  I'd object.  If there are documents,

6  then they should be produced.  But I don't think -- and I

7  think that's the best evidence, and I don't think,

8  particularly, given the fact that the agent says he hasn't

9  even reviewed them, that it's fair and to permit him to

10  testify on the basis of what he may or may not think the --

11          THE COURT:  Well, I'll take the testimony and then

12  we'll go from there.

13          MR. TOBIN:  Thank you, Your Honor.

14          BY MR. TOBIN:

15      Q    Please continue your answer.

16      A    Special Agent Kevin Sawyer has described the

17  documents to me and they generally fall -- those documents,

18  which had defendant Willie Hester's name on them, along with

19  other documents that had defendant Barnes's name and home

20  address written on them.

21          THE COURT:  Your Honor, may the record also

22  reflect -- I didn't want to interrupt at the time.  But may

23  the record also reflect that when Mr. Shapiro questioned

24  Special Agent Story as to whether or not he could identify

25  Mr. Barnes, that in fact, the record should reflect that the

1    witness pointed out Norman Barnes.  I think the record

2    indicated he said he's the person furthest to his left.

3              THE COURT:  So noted for the record.

4              MR. TOBIN:  Thank you, Judge.

5              (Pause.)

6              MR. TOBIN:  Your Honor, I have no other questions

7    of this witness.  Thank you.

8              THE COURT:  Okay.

9              MS. FRIED:  Could I briefly cross on the -- on the

10   subject that he --

11             THE COURT:  Yes.  You can all have one go at it,

12   on that limited area.

13             MR. COVIELLO:  Should we go in the same order

14   then?

15             THE COURT:  You should.

16             MS. FRIED:  Oh, I --

17             MR. COVIELLO:  Thank you.

18             THE COURT:  Thank you, Mr. Coviello.

19             MR. COVIELLO:  Thank you, Judge.

20                    RECROSS EXAMINATION

21             BY MR. COVIELLO:

22        Q    Just briefly, Special Agent.  Were there any

23   documents or any other evidence that would connect

24   Mr. Ellard to either of the motor vehicles?

25        A    No, sir, other than the cell phone, which I

1  believe was seized from the vehicle, rather than from

2  defendant Ellard's person.

3      Q     Where was it seized, if you know?

4      A     I believe it was in the front of the Honda.

5      Q     Front passenger side area?

6      A     Yes, sir.

7      Q     Either on the seat or on the floor?

8      A     Yes, sir.  I believe it was on the floor, but --

9            MR. COVIELLO:  Thanks.  That's all.

10           MS. FRIED:  Thank you, Your Honor.

11           THE COURT:  You're welcome.

12                     RECROSS EXAMINATION

13           BY MS. FRIED:

14     Q     Agent Story, at what time was the Honda Civic

15  searched?

16     A     It was searched probably a half hour after the

17  arrest, and that vehicle was moved to the DEA headquarters.

18     Q     And did that search take place in the parking lot

19  of Bickford's or at the DEA headquarters?

20     A     A cursory search of both vehicles occurred at the

21  Bickford's lot, and then both vehicles were relocated for a

22  more detailed search, under better conditions.

23     Q     Okay.  Now, during the course of the cursory

24  search -- well, first of all, where did the cursory search

25  of the Honda take place?  Was that in the parking lot?

1      A    Yes, ma'am.

2      Q    All right.  During the cursory search of the Honda

3  in the parking lot, is that when the gun was discovered?

4      A    No, ma'am.

5      Q    All right.  Is it then accurate that the gun that

6  was referred to in your direct examination testimony that

7  was discovered during the later search at DEA headquarters?

8      A    Yes, ma'am.

9           MR. TOBIN:  Objection.  That was well beyond the

10  scope of the very limited questions that I asked on my

11  redirect.

12          THE COURT:  I think I have to agree.

13          MS. FRIED:  Your Honor, then -- well, I -- he

14  brought out -- he brought out evidence relating to the

15  search.

16          THE COURT:  Of the other vehicle.

17          MS. FRIED:  No, of -- of the Honda; of the Honda,

18  specifically, the documents relating to the Honda Civic.

19  That was -- his questioning was all about documents --

20          THE COURT:  Wait a minute.  Wait.

21          (Pause.)

22          THE COURT:  All right.  You may have your

23  question.

24          MS. FRIED:  Thank you very much.

25          BY MS. FRIED:

88

1     Q   Now, with respect to these documents that you

2  refer to on your redirect examination that related to

3  Mr. Hester and Mr. Barnes that were taken from the Civic, do

4  you recall where those documents were found in the Honda

5  Civic?

6     A   I do not.  I know they were seized from within the

7  passenger compartment of the vehicle, as a whole.

8     Q   Okay.  You didn't see them, yourself?

9     A   No, I did not.

10    Q   Do you know what agent found them?

11    A   I do not.  I know that Special Agent Sawyer has

12  reviewed them.  I am not presently aware of the seizing

13  agent.

14    Q   All right.  And -- okay.  And were those documents

15  found during the cursory search that took place at the

16  Bickford's parking lot?

17    A   No, ma'am.

18    Q   Those documents then were recovered during the

19  later search that was done at that DEA lot?

20    A   That's correct.

21    Q   About a half an hour after the arrests were

22  effected?

23    A   Yes, ma'am.

24    Q   All right.  And am I correct that as was the case

25  with the search of the Focus, there was no search warrant

89

1   obtained for the search of the Honda Civic?

2       A    That's correct.

3       Q    All right.

4            (Pause.)

5       Q    Now, this cell phone that Mr. -- I'm sorry --

6            MR. TOBIN:  Tobin.

7            BY MS. FRIED:

8       Q    -- Mr. Tobin -- Mr. Tobin asked you about on your

9   redirect examination, was that found during the cursory

10  search of the Honda Civic?

11           MR. TOBIN:  Objection, Your Honor.  I never asked

12  about a cell phone.

13           MS. FRIED:  Didn't it come up?  I think that was

14  -- I think it came out during the course of the answer or

15  during the -- oh, I think that Mr. Coviello's -- it came out

16  during the portion of Mr. Coviello's questions, I believe --

17           THE COURT:  That's right.

18           MS. FRIED:  -- on the -- on his re-cross

19  examination about a cell phone that was recovered during the

20  course --

21           THE COURT:  That's correct.

22           MS. FRIED:  -- of the search.  If I could put the

23  question to the witness about whether that was found during

24  the course of the cursory search of the Honda Civic or found

25  during the later search?

*APEX Reporting*
(617) 426-3077

1          THE COURT:  Well, I'm letting you go a far -- a

2    bit far afield, but one more question.

3          MS. FRIED:  Thank you.

4          THE WITNESS:  Yes, it was.

5          BY MS. FRIED:

6    Q    During the cursory search?

7    A    Yes, ma'am.

8    Q    All right.

9          (Pause.)

10   Q    Were any other items of investigative interest,

11   besides the cell phone, the gun and the documentary evidence

12   that you had reason to testify about now recovered during

13   either the cursory search or the subsequent search of the

14   Honda Civic?

15   A    Yes, ma'am.

16   Q    And what was that other evidence of investigatory

17   interest?

18   A    Two items, in particular.  One, being the cell

19   phone.  I believe defendant Hester possessed and the cell

20   phone that was used by defendant Ellard, as they drove into

21   the lot.  One of the final conversations that occurred

22   between defendant Ellard and the undercover agent occurred

23   during on a different cell phone, which we believe to be

24   defendant Hester's phone.  That second phone was seized in

25   the car.  And additionally, there was a necklace that was

1  seized from the vehicle.

2      Q    And the ownership of the -- this ownership of the

3  necklace ever determined?

4          MR. TOBIN:  Objection, Your Honor.  I asked a

5  series of very short questions, specifically about

6  documents.

7          THE COURT:  This is getting a little bit beyond.

8          MS. FRIED:  All right.  I'm done.  No further

9  questions.

10          THE COURT:  All right.  Mr. Cox?

11          MR. COX:  Thank you, Your Honor.

12          THE COURT:  You're welcome.

13                    RECROSS EXAMINATION

14          BY MR. COX:

15      Q    Agent Story, with the various documents seized

16  from the vehicle, was Tavon Robinson's name referenced in

17  any of them?

18      A    I don't believe so, sir.

19          MR. COX:  Thank you.

20          THE COURT:  Mr. Feinberg?

21                    RECROSS EXAMINATION

22          BY MR. FEINBERG:

23      Q    Same question with Mr. Tucker.

24      A    The documents which would pertain to Mr. Tucker

25  were the -- would be the sister's rental agreement.

1    Q    And was that seized at the time of the cursory

2  search or later?

3    A    I believe later.

4    Q    At the cursory search, were -- was there anything

5  seized at the parking lot from either vehicle, connecting

6  either vehicle to Mr. Tucker?

7    A    No, sir.

8        MR. FEINBERG:  Thank you.

9        THE COURT:  Mr. Shapiro?

10                   RECROSS EXAMINATION

11       BY MR. SHAPIRO:

12    Q    You referred to a document with Mr. Barnes's name

13  and address on it.  What document was that?

14    A    There are several documents and I have not

15  reviewed them and I can't answer exactly what they are.

16    Q    I mean, you say it was a document with his name

17  and address.  More than one?

18    A    Yes, sir.

19    Q    But they weren't ownership documents?

20    A    No, sir.

21    Q    And you have no idea what kind of documents it

22  were -- they were?

23    A    No, sir.  I'd have to review those documents to --

24    Q    So you can't say whether they were handwritten

25  notes on a piece of paper or something else?

1    A    They're documents of some fashion, not handwritten

2    notes.  They may include handwritten notes, but the

3    documents that were found would be documents which would

4    normally reflect entries being made for someone's name,

5    address, so on and so forth.

6    Q    Nothing illegal about the document itself, was

7    there?

8    A    No, sir.

9    MR. SHAPIRO:  Nothing further, thank you.

10    THE COURT:  All right.  That concludes Special

11    Agent Story's testimony.  Does the government have

12    additional witnesses?

13    (The witness is excused.)

14    MR. TOBIN:  Your Honor, we have two documents that

15    we'd like to put in.  One, is -- and I've provided copies to

16    the respective counsel.  One, is a document relating to

17    Tavon Robinson.  It's a case in which he's currently on

18    default -- a gun case -- out of the southern New Jersey area

19    that we've obtained from the Cumberland County prosecutor's

20    office.  I've provided a copy to Mr. Cox, before the

21    hearing.

22    THE COURT:  All right.

23    MR. TOBIN:  I would offer that into evidence.

24    MR. COX:  No objection, Your Honor.

25    THE COURT:  All right.  It will be marked as

1    Government's Exhibit 2, for the purpose of this hearing.

2                        (Government's Exhibit No. 2 was

3                        marked for identification.)

4            MR. TOBIN:  And also, Your Honor, Mr. -- among his

5    cases that he's on pretrial release for, Mr. Barnes is on

6    pretrial release on a marijuana distribution case pending

7    out of Brockton District Court.  We've obtained those

8    records from the district attorney's office in Plymouth

9    County, and I've provided those records to Mr. Shapiro.

10           THE COURT:  All right.

11           MR. SHAPIRO:  And I do object to the introduction

12   of the police report, which is attached to the criminal

13   complaint.

14           THE COURT:  And the basis for your objection?

15           MR. SHAPIRO:  That it's -- it's hearsay; that it's

16   completely uncorroborated.  It's -- to the extent that it's

17   being -- that the government is introducing it, with respect

18   to establish Mr. Barnes's criminal record, that's already in

19   the pretrial services' report.  And to attempt to bolster a

20   case where there has not been a conviction with a police

21   report, I think is inappropriate and inadmissible.

22           THE COURT:  I don't think it is.  Government

23   Exhibit 3.

24                        (Government Exhibit No. 3 was

25                        marked for identification.)

1    THE COURT:  It's now four o'clock.  Do defendants
2    intend to call any witnesses?
3    MR. COVIELLO:  Jim Coviello on behalf of
4    Mr. Ellard.  No, Judge.
5    MS. FRIED:  No witnesses on behalf of Mr. Hester.
6    MR. COX:  None on behalf of Mr. Robinson, Your
7    Honor.
8    MR. FEINBERG:  None, Your Honor.
9    MR. SHAPIRO:  None on behalf of Mr. Barnes.
10    THE COURT:  All right.  Then I think you ought to
11    caucus and see when you want to come back to argue, because
12    obviously, to give everybody a chance, we need more time.
13    So the clerk will tell you what the day will hold (u) for
14    all of you.
15    (Pause.)
16    MR. COX:  How long in the future would be
17    convenient for the Court, Your Honor?
18    THE COURT:  Well, whenever you want.  I mean, do
19    we have time tomorrow?
20    (Counsel conferring.)
21    THE COURT:  What have you --
22    MR. COVIELLO:  Thursday, the 29th of April at
23    2:00, Judge?
24    THE COURT:  Let's see what we have.  Madam Clerk?
25    MR. COX:  Your Honor, I have a problem.  I have to

1  be in New York the rest of the week, unfortunately, so --

2          THE COURT:  Well, I can take the others and --

3          MR. COX:  I could do it Monday.

4          THE COURT:  I can take the others and defer yours,

5  if you want it done that way.

6          MR. COX:  That would be fine, Your Honor.

7          MS. FRIED:  We would appreciate it if the Court

8  would bifurcate it that way.

9          MR. COX:  Would Monday be convenient for the

10  Court, Your Honor?

11          THE COURT:  Sure.  What time, for Mr. Cox for

12  Monday?

13          THE CLERK:  Three o'clock.

14          THE COURT:  Three o'clock on Monday?

15          MR. COX:  Yes, Your Honor.  That's great.  Thank

16  you.

17          MS. FRIED:  And is two o'clock on Thursday

18  convenient for the rest of us?

19          MR. FEINBERG:  Your Honor, I'm going to try to

20  move my schedule to try to make it for the two o'clock on

21  Thursday, but if not --

22          THE COURT:  Well, let's see if it's available,

23  first.

24          MR. FEINBERG:  Oh, I'm sorry.

25          I thought it was already --

```
1              THE CLERK:  2:45?

2              MS. FRIED:  That's all right with me, if that's

3    all right with --

4              THE COURT:  You'll be able to wind up in an hour?

5              MR. FEINBERG:  That's all right with me, assuming

6    I can make some changes and I'll do that.  But I just want

7    to alert the Court that I may have to do it on Monday.

8              THE COURT:  Well, if not, you can come on Monday.

9              MR. FEINBERG:  Right.

10             MS. FRIED:  For 2:45, then?

11             THE COURT:  2:45.

12             MR. COX:  Judge, I'll -- if I could schedule mine

13   for that Monday, the 3rd, at three o'clock, that would be

14   easier for me.

15             THE COURT:  Okay.

16             MR. FEINBERG:  For whatever reason, my client

17   wants Monday, so I'll do it Monday.  Next Monday is fine.

18             THE COURT:  Okay.

19             MR. FEINBERG:  Is that the 4th?

20             THE COURT:  It's the 3rd.

21             MR. FEINBERG:  Well, that should be all right.

22             THE COURT:  So I'll hear the other two on Thursday

23   --

24             MS. FRIED:  Thursday, Your Honor.

25             THE COURT:  -- at 2:45.
```

98

1           MS. FRIED:  Thank you.

2           MR. COX:  Thank you, Your Honor.

3           THE COURT:  All right.  Hearing nothing else in

4    the interim, the defendants are remanded to custody of the

5    United States Marshal Services.

6           (Whereupon, on April 26, 2004, the hearing was

7    concluded.)

## CERTIFICATE OF TRANSCRIBER

This is to certify that the attached proceedings

before: <u>U.S. DISTRICT COURT, DISTRICT OF MASSACHUSETTS</u>

in the Matter of:

```
UNITED STATES OF AMERICA,        )
                    Plaintiff,   )
                                 )
-V-                              )    MAGISTRATE DOCKET NO.
                                 )    04-00817-MBB
ADAM ELLARD, et al               )
                    Defendants.  )
```

Place: Boston, Massachusetts

Date:  April 26, 2004

Were held as herein appears, and that this is the true,

accurate and complete transcript prepared from the

recordings taken  of the above entitled proceeding.

```
J. Mocanu                        07/08/04
Transcriber                      Date
```