UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
UNITED STATES OF AMERICA,   )
    Plaintiff,                             )
                                                  )
    v.                                           )        CRIMINAL NO. 04-10168-PBS
                                                  )
NORMAN BARNES,                     )
    Defendant.                           )
_____)

### DEFENDANT NORMAN BARNES' SENTENCING MEMORANDUM

Defendant Norman Barnes has pled guilty to two counts of an indictment charging him with conspiracy to distribute cocaine (Count One) and distribution of cocaine (Count Two). The charges arise out of an April 12, 2004 sale of 28.2 grams of cocaine powder to an undercover agent. This Court expedited the sentencing proceedings in this case, after colloquy on two occasions[1] established that there was a risk that defendant's detention might exceed his sentence. This was based on the fact that on each of those occasions, the government and defendant agreed (1) that the drug quantity involved was 28.2 grams, resulting in a Guideline base offense level of 14 under USSG §2D1.1(13) ; (2) that defendant had a Criminal History Category III; and that the only issue to be determined was whether he was entitled, as he claimed, to a reduction for a mitigating role under §3B1.2, and thus a Guideline range of 10-16 months, or not, in which case he would have a Guideline range of 15-21. Since defendant has been in custody since April 12, 2004, by February 18, 2005, the date of his now scheduled sentencing, he will already have served more than ten months.

---

[1] Hearing on Defendant's Motion for Review of Detention Order (11/01/04); Plea Hearing (12/13/04).

Suddenly, however, the government now claims that the relevant drug quantity is not 28.2 grams of cocaine, but 3.5 grams of cocaine base ("crack"), and, further, that the defendant should receive an upward adjustment of four points, under §3B1.1, for the role of organizer/leader. At the same time, in the Presentence Report, the Probation Department proposes to score the defendant as a Criminal History IV, by counting, as fully as an adult offence, a juvenile delinquency finding imposed for the offense of receiving and using a stolen credit card when defendant was fourteen years old. Furthermore, it proposes to increase the defendant's offense level by two points, under §2D1.1(b), because other conspirators (although not he) possessed a firearm.

However, as explained below, the government's new theories are wrong and disingenuous, at best. The Probation Department's firearm adjustment is erroneous. The PSR criminal history calculation, while technically correct, overstates the defendants history under settled (and encouraged) Guideline rules for departure.

In short, nothing has changed. For the reasons set forth below, the defendant is entitled to a minor participant role adjustment and, accordingly, an adjusted offense level of 10, with a range of 10-16 months. And if, for example, he then receives a sentence of ten months, or alternatively of 12 months and one day (on which he would receive good time), he would be eligible for release immediately or in a matter of days. In other words, under a faithful application of the Guidelines, the Court may sentence the defendant to time-served. Even if that were not so, however, the Court has the discretion, under United States v. Booker, 125 S.Ct. 738 (2005) to sentence the defendant according to its application of the factors set forth in 18 U.S.C. §3553(a) – which leads to the same conclusion, to wit, that the time defendant has already served is sufficient punishment for his offense conduct.

**I. The Base Offense Level Under USSG §2D1 Is 14, As There is no Valid Basis to Charge the Defendant with 3.5 Grams of Cocaine Base.**

The government now claims, based on Adam Ellard's testimony in the Robinson trial, that defendant was involved in packaging 3.5 grams crack cocaine for sale several days prior to the April 12 transaction.  Under the Guidelines, it argues, 3.5 grams of crack results in a BOL of 22 – making the 28.2 grams of cocaine powder on April 12 irrelevant as a practical matter.

The government's newly minted theory is flawed for four fundamental reasons.  First, even if based on fact, the supposed prior incident involving cocaine base would not constitute "relevant conduct" which should be counted under USSG §1B1.3(a)(2).  Uncharged conduct is relevant only if it involves the "same course of conduct or common scheme or plan," as the offense of conviction.

> Not every drug transaction undertaken by every drug trafiicker is necessarily linked in a meaningful sense.  See [United States v. White, 888 F.2d 490, 500]('Offenses of the same kind, but *not* encompassed in the same course of conduct or plan, are excluded.'

United States v. Sklar, 920 F.2d 107, 110 (1990).  Thus for example, in United States v. White, supra, distribution of cocaine on two separate occasions were not sufficiently linked where the defendant's sources and the customers differed.    In this case, the two incidents were clearly not part of the same course of conduct or plan – and the government did not even think so, at least until its recent afterthought.  Thus, in the Superseding Indictment (issued after defendant Barnes had already pled) it alleged, as to Willie Hester, that:

> [T]he defendant Willie Hester is accountable for at least 25 grams but less than 50 grams of cocaine.  Accordingly, USSG §2D1.1(c)(13) applies to this defendant.

(Exhibit H, Notice of Additional Factors, p. 8, ¶3.)  Obviously, the quantity attributable to Willie Hester, is precisely the same as that accountable to Barnes.  And this conclusion was clearly correct.  Most importantly, the two episodes involved entirely different drugs.  The offense of conviction involved cocaine powder – which, of course, is pointedly distinguished in the indictment,[2] the statutes, and the guidelines, from crack.  Cf. e.g. United States v. Glenn, 828 F.2d 855 (1st Cir. 1987)(conspiracies to distribute cocaine and hashish were separate and should not have been joined for trial).  The members of the conspiracy were different: here, the defendant conspired with Ellard, Robinson, Tucker and Hester to distribute cocaine powder; in the prior episode, defendant allegedly was involved only with Hester – and not Ellard, Robinson or Tucker.   And, as in White, the customers differed as well.

Second, at the plea hearing, in open court, the government and defendant stipulated that defendant was accountable for 28.2 grams.  While defense counsel has not yet obtained the exact language of the agreement,[3] its purpose was to establish precisely what the government alleged in the superseding indictment as to Hester, to wit, that defendant was accountable for more than 25 and less than 50 grams.[4]  This then, was a basis for the plea, and the government cannot now

---

[2] Compare Count One (conspiracy to distribute "cocaine") with Count Two (distribution of "cocaine base, commonly known as 'crack cocaine'")(charging Ellard alone).

[3] Counsel has requested it from the court stenographer.

[4] Just prior to the plea, the Assistant United States Attorney inquired of counsel as to whether defendant would stipulate to the drug quantity for which defendant was accountable. (This was to avert a possible challenge under Blakeley v. Washington, 542 U.S.___ (2004), in view of the fact that Booker had not been decided.)  Otherwise, he stated, he would request a continuance of the plea hearing so that he could obtain a superseding indictment alleging the quantity of drugs, as he indeed did with respect to the other defendants.  See Affidavit of Max D. Stern, Exhibit J.

be heard to argue to the contrary.  See Santobello v. New York, 404 U.S. 257, 262 (1971); United States v. Clark, 55 F3d 9, 12 (1st Cir. 1995); United States v. Kurkculer, 918 F.2d 295 (1st Cir. 1990).

    Third, in any event, the new theory is not based on fact.  A determination of relevant conduct must be premised on "dependable" information, with "indicia of reliability."  United States v. Sklar, supra, at 110.  The government's claim here is based solely on the entirely unreliable, completely uncorroborated, and ever-changing account of a cooperating witness, who admits that he was "stoned on crack" at the time (Ellard Tr. P. 18), and who faced a minimum sentence of more than twenty years if he did not satisfy the government that his cooperation was "substantial."[5]  The point of this part of his story was to explain how he had come to deal with Hester – who was introduced to him by Hester's girlfriend, Laura deSilva.  (Ellard Tr. P. 20).  In Ellard's first version, in his immediately post-arrest statement, he said nothing about personally observing Barnes or Hester in any other drug transaction.  Instead, "he stated that he called LAURA because she had told ELLARD in the past her man had the good stuff (crack cocaine)." (Exhibit B, Report of S/A Timothy Desmond, May 6, 2004, p. 2)(caps in original; emphasis added).  By the time Ellard made a proffer to the government – apparently in May, 2004 – he improved his story somewhat, and stated that:

---

[5] Ellard's Plea Agreement is attached as Exhibit A.  In it, he and the government agreed that he is a career offender, that his BOL is 37 and Criminal History Category is VI.  With a three level adjustment for acceptance of responsibility, the Guidelines specify a sentence of 262 to 327 months.  Exhibit A, p.2, ¶3.

-5-

> he knew a woman named "Laura" from Dorchester, that he knew that "Laura" had a boyfriend named "Willie" (Hester), and that he knew "Willie" was a drug dealer because he had observed "Willie" and his friend (Barnes) engaging in transactions in the past.

(Exhibit C, Government's Version of Offense Conduct, December 28, 2004, p. 15; PSR ¶42). This account, however, contained no details of any such "transactions" and no reference to packaging 3.5 grams of crack. Indeed, by the time the defendant pled guilty, and the government supplied its offense version to the Probation Department, prior to the Robinson trial, Ellard had still not added this major detail, and the government's version included no reference to the supposed packaging incident. (Id.) But when the Robinson case came to trial, Ellard refined his version, reducing the observed transactions to one, and adding the 3.5 gram "eight ball" observation. But there is no corroboration whatsoever of Ellard's claim to having seen a prior transaction – no drugs, no tape, no admission. And the story is implausible in any event, as it is highly unlikely that two alleged drug dealers would be involved in dividing and packaging $150 worth of drugs for resale.[6] Most significant of all, however, is that when put to the acid test, neither Hester nor Barnes, in fact, "had the good stuff (crack cocaine)" – they could not, and did not, produce the crack cocaine which Hester had promised to Ellard.

Finally, and decisively, even if one assumes – wholly contrary to reason – that Ellard was trying to be truthful at trial on this point, his testimony does not provide any reliable basis to assess either the type or amount of the drugs. One should not forget that in this very case, the experienced DEA agents who made the arrest and seized the drugs concluded that the cocaine powder they obtained in the April 12 transaction was crack cocaine — and therefore so charged

---

[6] Ellard testified that the 3.5 grams of crack were worth $150. (Ellard Tr. P. 22).

the defendants in the initial Complaint. But this conclusion turned out to be totally wrong! Assuming arguendo that Ellard did see what he claimed, this Court has no way of knowing – based on Ellard's observation alone – whether the substance was cocaine base, cocaine powder, or something else altogether. And, of course, if the substance were powder and not base, then 3.5 grams – added to 28.2 grams – the total would still be less than 50 grams and would not change the BOL at all.

## II. The Defendant is Entitled to a Minor Role Adjustment Under §3B1.2.

Again basing its claim on Ellard's testimony, the government contends that defendant should be given a four level increase as a organizer or leader of criminal activity, because he is alleged to have been the one to insist "no money, no drugs." Defendant denies making this statement and, again, Ellard's story is uncorroborated.[7] But, even if true, this would not elevate defendant's involvement to anything more than a minor role. The government fails to note that there is no evidence that Barnes did anything else in the entire transaction. He did not organize it – that was done by Ellard. He did not negotiate with Ellard – that was done by Hester. He did not drive either car – the drivers were Hester and Robinson.[8] He did not handle the drugs – that

---

[7] Ellard claims that Hester told him to speak to Barnes. But it is undisputed that Barnes was in the rear of the Ford Focus. Nevertheless, the agents conducting the surveillance consistently reported that each time that Ellard went to converse with the occupants of the Ford Focus he went to the front passenger side window. (Exhibit D, Report of S/A DiTullio, 4/13/04, p.3, ¶¶6,8; Exhibit E, Grand Jury Testimony of S/A Kevin Sawyer, 4/20/04, pp 29, 31) To be sure, each of the agents stated that it "appeared" that Ellard was speaking to all of the occupants. But they were not in a position to see or hear who was saying what to whom. And, more to the point, there was no evidence that Barnes was dictating orders to anyone else.

[8] The fact that documents were found in the Honda which indicated that defendant had driven that car in the past, and that it belonged to members of his family, is a complete red herring. The government has failed to point out that the car, which was driven by Willie Hester,

was done by Robinson. He did not have possession of any weapons – these were in the possession of, or traced to, Robinson, Tucker, and Hester, but not Barnes. He did not run when the agents arrived. If, as a conspirator, he expressed an opinion that the money should precede the drugs, then he did no more than agree with similar statements made by others. According to Ellard, Tucker also said, "Without the money, you ain't getting the drugs." (Ellard Tr. P. 35). And Robinson was the one who dominated the conversation. Ellard said:

> Initially when I went over and I started talking to him, I believed that Barnes was in possession of the drugs. But then the driver started talking over Barnes, and then communication between me and the driver was more than me and Barnes.

(Ellard Tr. P. 56). Indeed, it is abundantly clear from who had and took the initiative at the scene, that if anyone was in control it was Robinson.

The baseline here is established by Ellard's role, which, by any standard, was more culpable and involved than the defendant's. According to Ellard's plea agreement, the government believes that he deserves no role enhancement at all, (Exhibit  , p.2, ¶3), despite his actual role in organizing the entire transaction. Since the purpose of a role adjustment is to assess relative culpability, in the offense and in general, e.g. United States v. Sanchez, 354 F.3d 70, 74 (1st Cir. 2004); United States v. Jurado-Lopez, 338 F. Supp. 2d 246, 252 (2004), then by the measure of the government's assessment of Ellard's function and culpability, defendant Barnes clearly warrants a two level downward adjustment for his minor role.

---

was equally available to Hester, a close friend, who frequently borrowed it from Barnes' mother. See Grand Jury Testimony of Lloyd Powell (Exhibits F) and Sophie Barnes (Exhibit G).

-8-

### III. There Is No Basis for a Two Level Increase for Possession of a Firearm.

There is no evidence, and no contention, that defendant Barnes either possessed a firearm or knew that any of his co-conspirators possessed firearms. Nevertheless, the Probation Department proposes, in PSR ¶53, a two level increase since "two firearms were recovered from the engine compartment of the Ford Focus utilized during the drug transaction . . . . This is the same area from which Tavon Robinson had removed the cocaine." The proposed increase is based upon USSG ¶2D1.1(b)(1) which requires a two level authorizes a two level increment "[i]f a dangerous weapon (including a firearm) was possessed." (Emphasis added). However, the First Circuit has held that under this Guideline provision, a defendant who neither possesses a firearm nor knows of a codefendant's possession, does not warrant the increase unless the possession by the codefendant was "reasonably forseeable" to him. United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991). Under the Court's analysis, reasonable forseeability may be inferred from a "large amount of drugs," or a "large amount of cash," but even when so inferred, may be rebutted by other circumstances or evidence. Id. Thus, for example, in Bianco, reasonable forseeability was inferred from the defendant's knowledge of the plan to purchase one hundred pounds of marijuana for eighty thousand dollars in cash. (Id. at 913). Similarly, in United States v. Robles, 4 F.3d 1026, 1030, 1036 (1st Cir. 1993), the parties agreed to exchange 75 kilos of cocaine for $500,000 in cash. In these cases, the sheer size of the transaction gave reason to foresee that someone would have firearms for protection. By contrast, in this case we have a single ounce -- 28.2 grams -- and the sum of $2350 in buy money. What's more, the drugs were in the collective possession of five conspirators, who thought they were dealing with

-9-

a single purchaser. These facts do not support any inference that Barnes would foresee the need for weapons; on the contrary they rebut it.

## IV. **The Proper Criminal History Category for Defendant is Category III.**

Despite the parties' prior understanding that defendant's Criminal History Category is III, the PSR calculates it as Category IV. The different score is based upon assigning 2 points to defendant's first juvenile delinquency offense, that of receiving and using a stolen credit card, committed when he was fourteen years old. PSR ¶61. The score is technically correct under the Guidelines, which, with minor exceptions, give equal weight to juvenile and adult convictions, regardless of severity. Under §4A1.2(d)(2)(A), the offense is counted because defendant was committed to DYS for "at least sixty days" and "was released from such confinement within five years of his commencement of the instant offense." Here the defendant served 80 days in DYS, from March 10 to May 30, 2000 and since he is still a young man – not far from his juvenile record – it falls within the 5 year window.

If defendant had served just 20 days less on this offense, it would not count at all. As it stands, the less than three month commitment for receiving and using a stolen card as a fourteen year old ranks as severely as a five year commitment of an adult for a violent crime. Even before and without the aid of United States v. Booker, supra, the Guidelines provided authority for the Court to ameliorate this clearly arbitrary equation. USSG §4A1.3(b) authorizes the Court to depart downward "if reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the liklihood that the defendant will commit other crimes." This is an encouraged departure; it does

-10-

not require a finding that there exists a circumstance not adequately taken into account by the Sentencing Commission. United States v. Wilkerson, 183 F. Supp. 2d 373, 380 (D. Mass. 2002). The Guideline empowers the court to consider precisely the sort of arbitrary weighting of sentences as exits here under a technical application of the Guidelines. Id. at 381; United States v. Woodley, 344 F. Supp.2d 274, 278 (D. Mass. 2004). See also United States v. Lacy, 99 F.Supp.2d 108, 121-123 (D. Mass. 2000).

Perhaps the most important purpose and application of this departure authority has been to mitigate the otherwise harsh and inflexible Guideline treatment of juvenile offenses. Several courts have observed that this power provides the flexibility necessary to avoid what would otherwise be a substantial claim that the policy of treating adult and juvenile sentences alike constitutes an irrational exercise of delegated discretion, see United States v. Johnson, 28 F.3d 151, 288-89 (majority opinion) and 290 (opinion of Wald, J.)(concluding that guideline is nevertheless invalid)(D.C. Cir. 1994); or a violation of due process and equal protection, United States v. Davis, 929 F.2d 930, 933 (3d Cir. 1991). Departure is especially appropriate where the defendant shows that "the length of his confinement was unrelated to his underlying criminal conduct." United States v. Johnson, supra at 289.

In sum, defendant should receive no score for the juvenile offense. That leaves him with just two prior adult offenses, one for breaking and entering into an automobile[9], and the other for simple possession of cocaine. Category IV would clearly overstate this record.

---

[9] See police report, Exhibit K.

These principles apply with particular force to this case. The commitment in question was not only for a juvenile offense, and a relatively minor one at that, but the length of the confinement was in fact wholly unrelated to the underlying criminal conduct. The only reason that defendant was held for 80 days, as opposed to 30, was that he was being detained on account of a separate outstanding charge. He was released to his home when that charge was dismissed.[10]

---

[10] Defendant was committed to DYS custody on March 10, 2000. He was held first at DYS "Metro" detention for five days, and then sent to the Casa Isla Assessment and Stabilization Center. PSR ¶61. At the time, he was also subject to an armed robbery charge in the Roxbury District Court, but this was dismissed on May 24, 2000. PSR ¶63. He was released from DYS custody to his home six days later, on May 30, 2000. At Casa Isla, he was informed that he would have been released in 30 days, but for the open charge.

This is consistent with the results of counsel's investigation and the statement of defendant's Case Manager at the time, Ron Pasquale. Defense counsel spoke with Stephanie Finley, on the staff of the DYS Legal Department. Ms. Finley advised that Casa Isla was a short-term non-treatment facility which was used for three purposes: (1) initial assessment, which generally took approximately 30 days; (2) pre-trial detention; and (3) stabilization, which was short-term (1-7 days) disciplinary detention for violation of conditions of release. Reviewing Mr. Barnes' record, she noted that he was at Casa Isla for initial assessment. Ordinarily, a person such as Barnes, held on a first DYS commitment on a non-serious charge (such as receiving stolen goods) would be discharged to home after the initial assessment, with a release plan. She deduced from the record that Barnes was most probably held for the longer period solely on account of what is termed, in DYS parlance, as the "open bail case," involving the more serious Roxbury charge. Once that was resolved, he would have been released home, after a check on the suitability of the custodian (which would account for the six day delay between dismissal and release). See Affidavit of Max D. Stern, Exhibit J. This is confirmed by Mr. Pasquale, who states that :

> The fact that Norman was in our physical custody until the dismissal of the open Armed Robbery is consistent with my normal practice of duties. My normal practice was to keep any DYS committed client in custody until any and all serious open matters were disposed of properly. If there were not an open matter then Norman would not have been held in custody.

Letter of Ron Pasquale to Max Stern (2/3/05)(Exhibit I).

**V.     The Appropriate Sentence in this Case is the Time Already Served.**

In light of United States v. Booker, this Court's task is now to find the appropriate sentence, in light of the factors set forth in 18 U.S.C. §3553(a). Fundamental to sentencing under that section is what has been termed the "parsimony principle:" that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set for in paragraph (2) of this subsection."

Focusing – as required by subsection (1) - on the history and characteristics of the defendant, two facts are particular importance. First, this is not a case of a defendant who, having plenty of advantages and opportunities, chose a criminal course. It is fair to summarize the PSR as painting a picture of a young person who never had <u>any</u> advantage, or <u>any</u> real opportunity, or <u>any</u> meaningful guidance.[11] In short, Norman Barnes grew up in the street. Yet, despite this, when all is said and done, he has only two adult convictions – one for breaking into a car, and a second for simple possession of a Class B substance. Measured against this, the ten months defendant has already served is sufficient to satisfy all of the objectives of subsection (2).

When released, defendant will establish a home with Ms. Penee Wiggins, who is a strongly positive force in his life and with whom he has established a firm and supportive relationship. This provides him with hope and aspirations for the future.
Surely, it makes more sense at this point to give the defendant a nudge forward than to pile further useless prison time on top of that which he has already served.

---

[11] In light of Booker, the Court may consider this factor, dispute U.S.S.G. §5H1.12.

**Conclusion**

For the reasons set forth above, the defendant should be sentenced to time already served.

                    Respectfully submitted,

                    /s/ Max D. Stern
                    BBO NO. 479560
                    Stern, Shapiro, Weissberg & Garin, LLP
                    90 Canal Street, Suite 500
                    Boston, MA 02114-2022
                    617-742-5800

Dated: February 8, 2005