# EXHIBIT C

# Memorandum
United States Attorney
District of Massachusetts



| Subject | Date |
|---|---|
| United States v. Adam Ellard, et al. Criminal No. 04–10168-PBS | December 28, 2004 |

| To | From |
|---|---|
| U.S. Probation Department | David G. Tobin Assistant U.S. Attorney |

## Government's Version Of Offense Conduct

### Introduction

In the fall of 2003, the Mobile Enforcement Team ("MET") of the Drug Enforcement Adminstration ("DEA") was deployed in Gloucester, Massachusetts in order to investigate various forms of drug dealing in the Cape Ann area of Massachusetts. The MET Team's presence had been requested by the Gloucester Police Department, which was overwhelmed by the enormous drug problem on the North Shore. This case arose from the MET Team's deployment in Gloucester.

### March 3, 2004 Sale of 1000 Vicodin Tablets

On the night of March 2, 2004, two DEA agents acting in an undercover capacity ("the UCAs") were introduced by a confidential informant ("CI") to a female resident of Gloucester named Katherine Bertolino. The purpose of the meeting, which occurred at a restaurant in Gloucester, was for the UCAs to negotiate the purchase of Vicodin and crack cocaine from Bertolino, who brought a baby to the meeting. At the meeting, which was recorded and surveilled, Bertolino agreed to sell the UCAs 1,000 Vicodin tablets for $6.75 per tablet and a half-ounce of crack cocaine for $750. Bertolino informed the UCA that her source of supply would bring her the Vicodin tablets the next morning. The UCAs agreed to meet Bertolino the next day at 12:00 p.m. to purchase the drugs.

On March 3, 2004, at approximately 10:00 a.m., UCA-1 called Bertolino, who stated that she had not yet heard from her source of supply and that she would call UCA-1 back in a half hour.

United States v. Adam Ellard, et al.
December 28, 2004
Page 2

After a brief period of time, UCA-1 was called by a male who identified himself only as "Alex" and who questioned UCA-1 about where he was from and how he knew the CI. UCA-1 indicated that he was from the Worcester area and that he distributed drugs in that area. During the ensuing conversation, Alex stated that Bertolino "talked too much," that the CI could not be trusted, and that by cutting out the two middle people, UCA-1 could get the Vicodin tablets at a cheaper price. Alex and UCA-1 then negotiated a price of $6.50 per tablet and $625 for a half-ounce of crack cocaine. Alex told UCA-1 that he wanted to meet UCA-1 that day in Revere and that he would call UCA-1 when he was approaching the area. UCA-1 stated that he would be bringing a friend (UCA-2) and Alex stated that he too would be bringing a friend. Alex told UCA-1 that he was like "one stop shopping" and that he could get UCA-1 "anything he wanted." During this investigation, Alex was later identified as defendant Adam Ellard.

After a period of time, UCA-1 received a telephone call from Ellard, who explained that he had not had time to cook the crack cocaine. UCA-1 responded that it was okay and that he could get the crack cocaine at a later time, indicating that he still wished to purchase the Vicodin tablets. UCA-1 asked Ellard if the Vicodin tablets were in sealed bottles. Ellard responded that they were not in sealed bottles because a lot of people don't like the tablets in bottles because the bottles are "ten years each" (referring to a ten-year prison sentence). UCA-1 stated that he would call Ellard when he was in the Revere area.

Upon arrival at the Square One Mall in Revere, UCA-1 placed a consensually-recorded call to Ellard, who told UCA-1 to drive to the Northgate Shopping Center because he was headed there on a train to pick up his car from a repair shop. UCA-1 agreed to meet Ellard at a Pizzeria Uno restaurant near the Northgate Shopping Center in Revere. All or most of the above-described calls between Ellard and UCA-1 were recorded.

Shortly after their arrival at the restaurant, the UCAs observed two males enter the restaurant together. The two men were looking around as though they were looking for someone and UCA-1 gestured to them. During the introductions, Ellard stated "my name is Adam, not Alex, and this is my partner Troy." During the investigation, Troy was later identified as defendant Troy Brewer. Ellard told the UCAs that he had been in the drug business for thirteen years and that he had been arrested a few

United States v. Adam Ellard, et al.
December 28, 2004
Page 3

years ago in a raid on his house after being "set up" by his best friend at the time. He said that doing business with him would be laid back and relaxed and that his prices and quality were the best around. He stated that UCA-1 would not have to deal with Bertolino, indicating that she was just an avenue to obtain more customers. This meeting was recorded and surveilled.

After a brief period, Ellard told UCA-1 that they should go outside and talk while UCA-2 waited inside the restaurant with Brewer. When they got outside, Ellard led UCA-1 over to a gray Toyota 4-Runner, which contained a male in the driver's seat. Ellard introduced the male as "Meatball" to UCA-1. During the investigation, "Meatball" was later identified as defendant Timothy Herlihy.[1] Ellard explained that Herlihy was his runner for all his drug business. Ellard handed money to Herlihy and instructed him to go and get half of the Vicodin tablets. As Herlihy drove away, Ellard and UCA-1 returned to the restaurant and rejoined UCA-2 and Brewer.

DEA surveillance agents observed Herlihy drive to and from the Ocean View Condominiums on Revere Beach Boulevard in Revere. At the Ocean View, Herlihy was observed to pull into the first level of the parking garage. Herlihy was then seen driving slowly around the parking garage with an unidentified male in the front passenger seat of the Toyota. Herlihy was next observed departing the Ocean View without the unidentified male passenger and returning to the Pizzeria Uno restaurant.

Inside the restaurant, Ellard and UCA-1 negotiated extensively for the future purchase of a minimum of 1,000 ecstasy pills. Ellard stated he obtained ecstacy pills in lots of one thousand and that he does things carefully because if he got arrested again, he would go to jail for life. Ellard explained that he planned to deal heavily for approximately six months and then go to Florida with $250,000 to $300,000 in his pocket. He also bragged that he made "three-four grand" per week for doing absolutely nothing.

After this recorded conversation, all four men walked outside to the parking lot, where Herlihy's Toyota 4-Runner was

---

[1] DEA surveillance agents outside of the restaurant had observed all three men arriving together in the Toyota, which was leased from Toyota Motor Credit Corp. by **Timothy Herlihy** of Danvers. **Ellard** and **Brewer** were observed to exit the Toyota and enter the restaurant while **Herlihy** remained outside in the Toyota.

Case 1:04-cr-10168-PBS   Document 116-4   Filed 02/08/2005   Page 5 of 17

United States v. Adam Ellard, et al.
December 28, 2004
Page 4

observed returning to the lot. UCA-1 used his cell phone to contact another undercover agent ("UCA-3") who came to the location with $3,200 in cash. Ellard told UCA-1 that after the purchase of the first 500 pills, the UCAs could follow him to a nearby Blockbuster video store to obtain the next 500 pills. After receiving the money from UCA-3, UCA-1 got into the back seat of the Toyota 4-Runner, sitting next to Ellard. Herlihy then drove the Toyota 4-Runner through the parking lot while UCA-2 followed in a separate car. Brewer sat in the front passenger seat. While in the Toyota, Ellard handed UCA-1 a clear plastic bag containing 500 blue Vicodin tablets. After inspecting the tablets, UCA-1 handed Ellard $3,200 in cash. UCA-1 then exited the Toyota 4-Runner and returned to the car driven by UCA-2.

The two cars proceeded to the nearby Blockbuster video store, where Ellard was observed being dropped off and entering the Blockbuster video store. The UCAs observed Herlihy and Brewer drive away in the Toyota 4-Runner. UCA-1 then called Ellard, who stated that "Meatball" and "Troy" had gone to get the other 500 pills and that they would be back in a few minutes as his source lived nearby.

DEA surveillance agents again followed the Toyota 4-Runner to the Ocean View Condominiums on Revere Beach Boulevard in Revere. The Toyota 4-Runner pulled into the complex's parking lot and, after about five minutes, it left the complex and returned to the Blockbuster parking lot.

As soon as the Toyota returned, Ellard exited the Blockbuster and walked over to the vehicle. After about a minute, Ellard approached the undercover car carrying a white bag. He got into the undercover vehicle and opened the white bag revealing a clear plastic bag which contained 500 Vicodin tablets. UCA-1 then placed another cell phone call to UCA-3, who had the remaining buy money, and asked UCA-3 to come with the rest of the cash. A short time later, UCA-3 arrived at the parking lot and was met by UCA-2, who brought the rest of the money back to the undercover car. Ellard handed the bag containing the Vicodin tablets to UCA-1, who handed Ellard $3,200 in cash. Before leaving the Toyota 4-Runner, UCA-1 told Ellard he would be in touch soon.

After this transaction, DEA surveillance agents followed all

United States v. Adam Ellard, et al.
December 28, 2004
Page 5

three men as they drove in the Toyota to a business in Salem, where Ellard went inside for a few minutes. After Ellard returned to the Toyota, the Toyota was driven back to Revere, where Ellard and Brewer were dropped off by Herlihy. Ellard later told DEA that he purchased cocaine from a source of supply who worked at the Salem business and that he gave cocaine to Brewer and Herlihy for assisting him in the drug deal.

The Vicodin tablets were submitted to the DEA laboratory for chemical analysis and were determined to contain hydrocodone, a Schedule III controlled substance which is the active ingredient in Vicodin. The net weight of the hydrocodone was determined by the DEA lab to be 834.6 grams (997.6 tablets).[2]

### March 9, 2004 Sale of Crack Cocaine

On March 8, 2004, UCA-1 had a consensually-recorded telephone conversation with Ellard concerning the purchase of the half-ounce of crack cocaine. Ellard agreed to sell UCA-1 the half-ounce for $625, stating that his stuff was the best, that he baked all of his product home-made, and that he would bet his life on it. They agreed to do the deal the following afternoon in the Dorchester section of Boston.

On the afternoon of March 9, 2004, the UCAs met with Ellard inside the Home Depot store in the South Bay Shopping Center in Dorchester. While inside the store, Ellard purchased a can of paint that he stated he needed for his home. This meeting was recorded, videotaped, and surveilled by DEA agents. After the three men exited the store, Ellard directed them to a blue GMC Sierra which Ellard claimed was his "new" truck. After their arrival at Ellard's truck, Ellard sold UCA-1 a clear plastic bag of crack cocaine for $625 in cash. Ellard also gave UCA-1 a sample of marijuana and stated that he would bring UCA-1 a sample of "rolls" (ecstasy) the next time they met.

The crack cocaine was submitted to a DEA laboratory for chemical analysis and was determined to be "cocaine base," a Schedule II controlled substance. The net weight was determined by the DEA lab to be 13.8 grams.

### April 12, 2004 Sale of Cocaine

---

[2]This transaction was charged against Ellard, Brewer, and Herlihy in a separate indictment, Criminal No. 04-10167-RCL, which is pending. Both Brewer and Herlihy were arrested on separate dates.

United States v. Adam Ellard, et al.
December 28, 2004
Page 6

On April 8, 2004, UCA-1 had a consensually-recorded telephone conversation with Ellard concerning a proposed purchase of two ounces of crack cocaine from Ellard. Ellard quoted a price of $1,175 per ounce ($2,350 in total) and he agreed to do the deal the following week.

On April 12, 2004, UCA-1 had consensually-recorded and unrecorded telephone conversations with Ellard concerning the proposed deal. After further negotiations, it was agreed that UCA-1 would meet Ellard at about 5:00 p.m. in the parking lot of a Bickfords Restaurant near the South Bay Shopping Center in Dorchester. This location is adjacent to the Southeast Expressway, a multiple-lane divided highway running north and south through Boston.

At about 5:30 p.m. on April 12, 2004, UCA-1 drove to the agreed-upon location and waited. UCA-1 had a series of telephone conversations with Ellard, who stated repeatedly that he was waiting for his ride and that he was on his way. At about 7:30 p.m., DEA surveillance agents observed a black Honda Civic (bearing a Massachusetts license plate) and a silver Ford Focus (bearing a New Hampshire license plate) driving in tandem to the agreed-upon location. Ellard was the front-seat passenger in the black Honda, which was driven by a male later identified as defendant Willie Hester (also known as "Little Willie Hester"). The silver Ford Focus was driven by a male later identified as defendant Tavon Robinson (also known as "T" and "Smooth"). The front-seat passenger was later identified as defendant Steven Tucker (also known as "Chill"), and the back-seat passenger was later identified as defendant Norman Barnes (also known as "Freedom"). The black Honda Civic parked in the middle of the lot facing UCA-1's undercover car. The silver Ford Focus was driven around the parking lot and passed closely by UCA-1's vehicle. The Ford Focus was then parked nearby in the lot facing the opposite direction from the Honda Civic.

Ellard exited the Honda Civic and got into UCA-1's vehicle. UCA-1 handed $2,300 in cash to Ellard, who counted the money. Ellard initially indicated that the crack was located in both cars - the Honda Civic in which he had arrived and the Ford Focus - while pointing out the Ford Focus. During the conversation, Ellard also indicated that the crack ocaine was in the Ford Focus. Ellard stated that he wanted to take half the money to the people in the Ford Focus but UCA-1 refused to allow Ellard to do this.

After further negotiations, surveillance agents observed

United States v. Adam Ellard, et al.
December 28, 2004
Page 7

Ellard exit from UCA-1's vehicle and walk over to the driver's side of the Honda Civic. Ellard then had a conversation with Hester, who was in the driver's seat. Ellard later stated that Hester told him to go talk to the back-seat passenger in the Ford Focus (Barnes). Surveillance agents observed Ellard walk over to the passenger side of the Ford Focus and appear to engage in conversation with Robinson, Tucker, and Barnes. Ellard later stated that Barnes stated that they would not allow Ellard to bring the drugs over to UCA-1 without seeing the money first. After several minutes, Ellard returned to UCA-1's vehicle and told UCA-1 to back up his car so that it would be directly behind the Ford Focus. UCA-1 did as instructed, with Ellard now seated in the front passenger seat of UCA-1's vehicle.

   After UCA-1's car was in position, Ellard attempted to persuade UCA-1 to give Ellard the money so that he could go to the Ford Focus and obtain the crack cocaine, stating that UCA-1 could trust Ellard and that he would be right back with the drugs. Again, UCA-1 refused to hand over the money. After several minutes, surveillance agents observed Ellard exit from UCA-1's car and walk over to the passenger side of the Ford Focus. Ellard appeared to engage in conversation with Robinson, Tucker, and Barnes. Ellard later stated that as he was talking with Barnes, Tucker stated that they were messing up this deal. Robinson then began to take control of the deal and stated that he would do the exchange himself. As this was occurring, UCA-1 told Ellard that he was going to wait in another part of the parking lot. UCA-1 then moved his vehicle a short distance away in the parking lot.

   Shortly after relocating his vehicle, UCA-1 observed Robinson exit from the Ford Focus, walk to the front hood area of the vehicle, lift the hood partially open, extract an unidentified object from under the hood, and place it in his jacket pocket. Robinson was then observed to walk back to the driver's side of the Ford Focus, lean into the car, and apparently have a conversation with Tucker and Barnes while Ellard remained at the passenger side of the Ford Focus. These actions were also observed by two nearby surveillance agents.

   Shortly thereafter, Robinson walked over to the passenger side of UCA-1's vehicle with his right hand inside his jacket pocket. As Robinson stated to UCA-1 that "this is taking too

Case 1:04-cr-10168-PBS    Document 116-4    Filed 02/08/2005    Page 9 of 17

United States v. Adam Ellard, et al.
December 28, 2004
Page 8

long," he pulled a plastic bag out of his jacket pocket and placed it on the front seat of UCA-1's vehicle. UCA-1 observed that the bag appeared to contain drugs inside it. Robinson then pulled out a smaller plastic bag from inside the bag, placed the smaller bag on the seat, and placed the other bag inside his jacket pocket. After Robinson indicated that everything was there, UCA-1 handed Robinson $2,350 in cash, who then walked back to the Ford Focus and opened the driver's side door.

The item sold to UCA-1 was later sent to a DEA laboratory for chemical analysis. It was determined to be cocaine hydrochloride, having a net weight of 28.2 grams and a purity of 90%.

### Arrests Of The Defendants And Recovery Of Contraband

As Robinson opened the driver's side door of the Ford Focus, DEA agents approached the car to make the arrests. Observing the approach of the agents, Ellard and Robinson fled on foot in opposite directions. Ellard ran toward a nearby Shell gas station and was apprehended there by local police officers who were working with DEA. While being chased by two DEA agents, Robinson ran toward the front of the Bickfords restaurant but directly at a local plain-clothes police officer, who was working with DEA and who pulled out his service weapon. Robinson then surrendered.

A DEA agent quickly handcuffed Robinson, walked him over to the agent's car, and read Robinson his constitutional rights from a laminated card. Robinson stated that he understood his rights as he had been arrested by every police station in Boston. The agent searched Robinson and found in Robinson's pocket a plastic bag containing crack cocaine, having a net weight of .51 grams and a purity of 81%, and marijuana, having a net weight of 3.9 grams as well as a business card for an Econo Lodge motel in Manchester, New Hampshire. The agent found in Robinson's jacket pocket cash, consisting of the buy money ($2,350) plus an additional $170.75.

The DEA agent asked Robinson if he would speak to the agent about this situation and Robinson responded that it didn't matter what he said because they had him, that he was an "ACC" (i.e., an armed career criminal), and that "Campbell" was after him (i.e., Special Agent Daniel Campbell of the Bureau of Alcohol, Tobacco & Firearms). When the DEA agent asked how he had obtained the cash, Robinson replied that he got it from "the white dude," gesturing toward the location where UCA-1 had been during the

United States v. Adam Ellard, et al.
December 28, 2004
Page 9

drug deal.  The DEA then asked whether the item Robinson sold to UCA-1 was crack cocaine or sham and Robinson replied that he did not know what the item was.

Shortly thereafter, another DEA agent walked over and questioned Robinson about his identity.  Robinson stated that his true name would cause "all the bells and whistles to go off," that he was an "ACC," and that they should ask Campbell.  Shortly thereafter, Robinson was asked if he had any pending cases and Robinson replied that he was out on bail from a case in New Jersey.

Due to the rapid approach of the DEA agents, Barnes and Tucker were unable to exit from the Ford Focus and they were arrested by DEA agents as they remained seated inside the car, Tucker in the front passenger seat and Barnes in the rear passenger seat.  The silver Ford Focus was impounded and moved to a different location.  The hood of the Ford Focus was opened and agents recovered two loaded firearms wrapped inside a white t-shirt from the engine block on the driver's side of the vehicle (i.e., from the same area from which Robinson had obtained the drugs): (1) a Ruger, Model P-89, nine millimeter, semi-automatic pistol, loaded with 10 rounds of ammunition; and (2) a Lorcin, Model L-9, nine millimeter, semi-automatic pistol, loaded with 9 rounds of hollow-point ammunition.  Both weapons were subsequently test-fired by a Boston Police Department ballistician and were determined to be working firearms.  The agents recovered from the trunk of the silver Ford Focus a blue ski mask and a box of 50 latex gloves.

As the agents were arresting Ellard, Robinson, Tucker, and Barnes, they noticed that Hester remained seated in the black Honda Civic, which was parked nearby, and that he slid back and down in the driver's seat.  Agents then approached the Honda Civic and arrested Hester, who immediately and falsely stated that he did not know why he was being arrested and that he had driven there to pick up his sister, who worked in the Bickfords restaurant.  When the agents pointed to Ellard and asked him about his passenger, Hester falsely replied that he did not know who that was and that he had driven there alone.  An agent recovered from Hester's pants pocket a plastic bag containing marijuana, having a net weight of 16.4 grams.  An agent recovered from the car a rolled cigarette containing marijuana, having a net weight of 1.6 grams.

A subsequent search of the black Honda Civic led to the recovery of a Raven, Model MP-25, .25 caliber, semi-automatic

United States v. Adam Ellard, et al.
December 28, 2004
Page 10

pistol, which was in a white sock inside a map pocket attached to the back of the front passenger seat (and accessible to the driver's seat). The handgun had an obliterated serial number and was loaded with 6 rounds of ammunition. A later examination by a Boston Police Department ballistician revealed that the weapon could not be fired in the condition in which it was found because the firing pin was broken and the slide recoil spring was missing.

The agents recovered from the glove compartment of the Honda Civic miscellaneous documents belonging to Barnes and Hester. These documents included Registry of Motor Vehicles documents relating to Hester's driver's license, a road service receipt dated March 17, 2004 in the name of Barnes, a traffic ticket dated April 5, 2004 given to Barnes, pieces of paper with the name "Eric Barnes" on them, and a piece of paper purporting to transfer the Honda Civic from "Kenny Barnes" to Lloyd Powell on March 2, 2004.

### Post-Arrest Statements Of Ellard

After Ellard was arrested, he was advised of his constitutional rights and he agreed to speak with DEA agents. Ellard stated that, after negotiating the deal with UCA-1, he began calling different drug dealers in order to obtain 62 grams of crack cocaine. Ellard stated that he intended to sell 56 grams (i.e., 2 ounces) to UCA-1 and to keep 6 grams for himself as profit. Ellard stated that he contacted Hester, whom he knew as a drug dealer, and negotiated a price of $1,950 for 62 grams. On the evening of April 12, 2004, Hester picked up Ellard at the latter's residence in Dorchester, while driving the black Honda Civic. Ellard stated that he asked Hester where the drugs were and Hester replied that they were in the car following them. Ellard then noticed that they were being followed by the silver Ford Focus, which contained three males. Ellard told Hester that he intended to break off 6 grams for himself.

Ellard stated that, at the Bickfords parking lot, he went back and forth between the cars because UCA-1 would not front the money. Ellard stated that he initially returned to Hester, who directed him to speak with the rear-seat passenger in the Ford Focus (Barnes). Barnes, however, would not allow the drugs to go over to UCA-1's car until he saw the money. Ellard stated that he also spoke with Robinson about breaking off 6 grams for Ellard. Ellard stated that, as the negotiations wore on, Tucker stated: "No disrespect but this is getting fucked up." Robinson then stated, "I'm gonna do this shit myself" and jumped out of

United States v. Adam Ellard, et al.
December 28, 2004
Page 11

the Ford Focus. Ellard stated that he tried to tell Robinson not to do the deal himself, fearing that he would be cut out of receiving either drugs or money. Robinson, however, reached under the hood of the car and walked over to UCA-1's car to do the deal.

### Post-Arrest Statements Of Tucker

On the morning of April 13, 2004, Tucker acknowledged that he understood his constitutional rights and agreed to speak with DEA agents. Tucker stated that he had known Robinson for 4-5 years and that they were both from the Creston Street area in Boston. Tucker stated that, on April 12, Robinson picked up Tucker at the latter's residence in Manchester, New Hampshire while driving the silver Ford Focus. They drove to Boston and hung out with friends. Tucker stated that, after 5:00 p.m., Robinson received a telephone call and, in response to the call, they drove to the Dudley Street area in Roxbury and picked up a male whom Robinson introduced as "Freedom" (Barnes). "Freedom" sat in the rear passenger seat of the Ford Focus.

Tucker stated that they then drove to Dorchester, where Tucker observed a white male (Ellard) enter a black Honda Civic. They followed the Honda Civic to the Bickfords restaurant and parked near the Honda Civic. Tucker stated that, at some point, he began to get a feeling as to what was going on and that he determined that this was a drug deal. Tucker stated that he observed Ellard walking among the three cars and that Ellard walked up to the passenger side of the Ford Focus, leaned in, pointed to Barnes, and stated: "You got the drugs and he got the money so what's so hard about this." Tucker stated that he then got on the telephone and was not aware of any other events. Shortly thereafter, Tucker and the others were arrested.

### Further Statements Of Robinson

On the morning of April 13, 2004, a Gloucester detective who was working with DEA assisted in transporting the defendants to the Marshals Service lock-up at the federal courthouse. While there, the detective observed Robinson and Barnes in the same cell and overheard a conversation between Robinson and Barnes in the cell. Robinson stated to Barnes: "it's not crack anyway, it's only coke, they'll see that when they test it at the lab." Robinson then looked directly at the Gloucester detective and stated: "that's right, I know you're listening, motherfucker, it doesn't matter anyway." Robinson then stated to Barnes that "when they came from everywhere, I could of gone boom-boom."

United States v. Adam Ellard, et al.
December 28, 2004
Page 12

### Further Investigation

After the arrests, DEA determined that the silver Ford Focus which had contained Robinson, Tucker, and Barnes had been rented on April 8, 2004 by Cleo Mercer, a female resident of Manchester, New Hampshire, from a Budget Rent-A-Car facility at the Manchester airport. The rental period was one week and the car was due back at the rental facility on April 15, 2004.

Cleo Mercer was contacted and she stated to DEA agents that she is the sister of Tucker, that she and Tucker grew up in Boston, that she relocated to Manchester approximately 8 years earlier, that Tucker had been staying at her residence in Manchester since January or February 2003 due to problems he was having in Boston, that Tucker was friends with Robinson, that Robinson had been a guest at her residence in Manchester, and that Tucker and Robinson had been in her residence on the night of April 11 but had not spent the night there. Mercer further stated that she rented the Ford Focus on April 8 in order to drive to a federal prison in Fairton, New Jersey to visit the father of her child, that she did not want to put mileage on the car that she owned, that she was going to drop off Robinson in Pennsylvania, that she ended up not making the trip due to work obligations, and that she simply kept the car until it was due back on April 15. Mercer stated that, on April 12, she went to work, that both Tucker and the rental car were at her residence in Manchester when she left for work, and that both Tucker and the rental car were gone when she returned on the evening of April 12.

DEA agents spoke with ATF Special Agent Daniel Campbell, who stated that he knew Robinson and that he had investigated Robinson for suspected firearms trafficking. Special Agent Campbell traced the two firearms that were recovered from the engine block of the Ford Focus rented by Cleo Mercer. Special Agent Campbell determined that the Lorcin nine millimeter semi-automatic pistol had been manufactured outside of Massachusetts and that it had been shipped to a licensed firearms dealer named Hampstead Trading Post in Hampstead, North Carolina. On September 5, 1998, that business sold the Lorcin and other firearms to Erica Griffin, a female resident of Newport, North Carolina. The Lorcin was subsequently reported stolen.

Special Agent Campbell determined that the Ruger nine millimeter semi-automatic pistol had not been manufactured in Massachusetts and that it had been shipped to a licensed firearms

United States v. Adam Ellard, et al.
December 28, 2004
Page 13

dealer named Riley's Sports Supply in Hooksett, New Hampshire. On September 23, 2003, that business sold the firearm to Christine Wheeler, a female resident of Manchester, New Hampshire. Wheeler was contacted and she stated that she is licensed in New Hampshire to possess a firearm, that she purchased the firearm for self-protection, and that, in 2004, her teenage son took the weapon out of her house without her knowledge or permission and transferred it to a classmate. When she discovered the firearm missing, Wheeler reported it stolen to the Manchester Police Department but she recently discovered that her son had taken the weapon.

At the time that he committed these crimes, Robinson was on default in a firearms case pending in a state court in New Jersey. At approximately 3:30 a.m. on December 27, 2002, Robinson was driving a rental car, containing two male passengers, in Millville, New Jersey (which borders Fairton, New Jersey). After the car was stopped for driving without its headlights on, the police learned that the car was overdue by three weeks at the rental car company, that Robinson had outstanding arrest warrants, and that Robinson's New Jersey driver's license had been revoked. Robinson was placed under arrest, the police discovered a bag of marijuana in his pants pocket, and the rental car was impounded. The police then discovered a .357 magnum revolver, loaded with 6 rounds of hollow-point ammunition, under the driver's seat.

Robinson and his two associates were subsequently charged in the Cumberland County Superior Court in Bridgeton, New Jersey with unlawful possession of a handgun and unlawful possession of "hollow nose" ammunition. Robinson was released on bail. On February 25, 2004, Robinson failed to appear for trial, his bail was revoked, and he was tried in absentia. The jury was sworn in on March 31, 2004. On April 1, 2004, the jury returned guilty verdicts against Robinson as to both charges. Robinson has not yet been sentenced and a bench warrant remains outstanding.

At the time that he committed these offenses, Tucker was on pretrial release from armed burglary charges pending against him in a state court in Manchester, New Hampshire. Tucker and two other males were accused of breaking into the home of a woman and her two minor children in Manchester, New Hampshire on the night of January 22, 2004, while armed with handguns and wearing bandannas and hooded sweatshirts, of using telephone cord to tie up the woman, of stealing personal property from the residence, and of threatening the woman with a handgun. Tucker was arrested

United States v. Adam Ellard, et al.
December 28, 2004
Page 14

and released on bail.

On April 15, 2004, Tucker was indicted in the Hillsborough County Superior Court in Manchester, New Hampshire on charges of burglary, armed robbery, and criminal threatening. In a separate case, Tucker was also indicted on a charge of receiving stolen property, involving an allegation that, in November 2003, he had knowingly received a Browning .45 caliber semi-automatic pistol that had been stolen from a resident of Manchester. Both cases remain pending against Tucker.

At the time that he committed these offenses, Barnes was on pretrial release from cases pending against him in the Suffolk Superior Court and the Brockton District Court. In July 2002, Barnes had been indicted in the Suffolk Superior Court on charges of assault with intent to murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, unlawful possession of a firearm, and unlawful possession of ammunition. In December 2003, Barnes had been charged in the Brockton District Court with possession of marijuana with intent to distribute in a school zone.

After the arrests, DEA determined that the black Honda Civic which had contained Hester and Ellard was registered to Lloyd Powell, a resident of Boston. DEA agents contacted Powell, who stated that he had been involved in a long-term relationship with Sophie Barnes, who is the mother of Barnes. Powell further stated that Sophie Barnes asked him to put the Honda Civic in his name for insurance purposes, that he agreed to do so, and that the car remained in the possession of Sophie Barnes and her children, all of whom lived at 58 Appleton Street in Brockton. Powell stated that he knew Barnes, that Barnes lived at his mother's address in Brockton, that Barnes had frequent access to the Honda Civic, and that he had observed Barnes driving the Honda Civic in the past. Powell also stated that he knew Barnes to be close friends with Hester and that he had seen them together in the past, sometimes in the Honda Civic.

DEA agents contacted Sophie Barnes, who confirmed that she had purchased the Honda Civic, that she had asked Powell to register it in his name, and that she kept it and several other cars at her address in Brockton. Sophie Barnes further stated that Barnes was her son, that Barnes resided on another floor at the residence, that Barnes had frequent access to the Honda Civic, and that Barnes was close friends with Hester.

At the time that he committed these offenses, Hester was on

United States v. Adam Ellard, et al.
December 28, 2004
Page 15

pretrial release from cases pending in two different state courts. In October 2003, Hester had been charged in the Quincy District Court with multiple counts of credit card fraud, forgery, uttering, larceny, and breaking and entering in the daytime. In January 2004, Hester had been charged in the Roxbury District Court with distribution of cocaine.

### Further Information From Ellard[3]

Beginning in May 2004, Ellard provided further information to the government in connection with this case. Ellard stated that he had been selling various drugs, including cocaine, crack cocaine, and Vicodin, prior to 2004. Ellard stated that he met the UCAs through "Katie" in Gloucester, that he sold Vicodin tablets to them in Revere in March 2004, and that he sold crack cocaine to them in Dorchester in March 2004. Ellard stated that Hester, Robinson, Tucker, and Barnes were not involved in these prior drug deals.

In connection with the Vicodin deal, Ellard stated that, after the deal, he traveled with Brewer and Herlihy to a source who worked in Salem. He purchased 3-4 ounces of cocaine from the source and he gave cocaine and money to Brewer and Herlihy for their roles in selling the Vicodin.

In connection with the crack cocaine deal, Ellard stated that he purchased cocaine from the same source, that he cooked the cocaine into crack cocaine himself, and that he sold some of it to the UCAs. Ellard further stated that he smoked some of this crack cocaine.

In connection with the final deal, Ellard stated that he knew a woman named "Laura" from Dorchester, that he knew that "Laura" had a boyfriend named "Willie" (Hester), and that he knew "Willie" was a drug dealer because he had observed "Willie" and his friend (Barnes) engaging in transactions in the past. Ellard stated that he negotiated the purchase of 62 grams of powder cocaine from "Laura" and her boyfriend (Hester) and that Hester agreed to pick up Ellard at his residence on the night of April 12. Ellard stated that he was picked up by Hester, who stated that the cocaine was in the other car and that "this will be a hard one." Ellard believed that Hester had brought 62 grams to

---

[3] The government agreed not to use this information against Ellard pursuant to U.S.S.G. § 1B1.8.

United States v. Adam Ellard, et al.
December 28, 2004
Page 16

the deal and that Ellard would get 6 grams and cash for his role in brokering the deal. Ellard confirmed that, during the negotiations, Hester instructed him to talk to the rear-seat passenger in the Ford Focus and that this person (Barnes) would not release the drugs until the money was received. Ellard stated that he recognized Barnes from past drug transactions involving Barnes and Hester. After speaking to all three occupants about the money, Tucker stated that "this is getting all fucked up." Robinson then took over, stating that he would do it himself, exiting from the car, popping the hood, and walking over to the undercover car.